[Sac. No. 7924. In Bank. Sept. 21, 1972.]

FRIENDS OF MAMMOTH et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF MONO COUNTY et al.,
Defendants and Respondents;
INTERNATIONAL RECREATION, LTD.,
Real Party in Interest and Respondent.

250

**COUNSEL**

John C. McCarthy and Young, Henrie & McCarthy for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Louise H. Renne and Nicholas C. Yost, Deputy Attorneys General, Carlyle W. Hall, Jr., John R. Phillips,

Frederic P. Sutherland, Beatrice Challiss Laws, J. Edd Steppe and Sandy English as Amici Curiae on behalf of Plaintiffs and Appellants.

N. Edward Denton, District Attorney, David M. Kennedy, Assistant District Attorney, Kronick, Moskovitz, Tiedemann & Girard, Adolph Moskovitz, Robert E. Murphy and Clifford W. Schulz for Defendants and Respondents.

Gray, Cary, Ames & Frye, R. Reaves Elledge, Jr., and Browning E. Marean III for Real Party in Interest and Respondent.

## OPINION

**MOSK, J.**—This case affords us the first opportunity to construe provisions of the California Environmental Quality Act of 1970 (EQA). (Pub. Resources Code, §§ 21000-21151.)[1] As the express legislative intent forthrightly declares, the EQA was designed to be a milestone in the campaign for "maintenance of a quality environment for the people of this state now and in the future . . . ." (§ 21000, subd. (a).) The specific question presented here is whether a municipal body is required to submit an environmental impact report (see § 21100) pursuant to section 21151 of the code before it issues a conditional use or building permit.

Real party in interest. International Recreation, Ltd. (International) filed an application for a conditional use permit on April 20, 1971, with defendant Mono County Planning Commission (Commission). The application described the proposed use as follows: "Two multi-story structures housing 64 1, 2, 3, 4 bedroom condominiums plus 120 studio-type condominiums, a proposed restaurant and specialty shops. All for sale. With ample parking and recreational facilities." The use permit report refers to a parcel of 5.5 acres, approximately 135 feet by 1,775 feet. It appears from the record that some six buildings are eventually contemplated each with a height of from six to eight stories. Thus a long and relatively narrow structure or series of structures in close proximity is proposed.

The Commission approved the use permit on May 6, 1971. Thereupon on May 21, Frederick Schaeffer and Richard Young, both members of the class represented by plaintiff Charles E. Griffin II, along with two other individuals, appealed the Commission's decision to defendant Mono County Board of Supervisors (Board). On June 14, 1971, the Board affirmed the issuance of the use permit.

---

[1]All code references are to the Public Resources Code unless otherwise indicated.

On July 12 plaintiffs Friends of Mammoth[2] and Griffin filed a petition for a writ of administrative mandamus with the Court of Appeal attacking the validity of the permit. On July 15, the court denied the writ without prejudice to the filing of proceedings in the superior court. On July 19, plaintiffs filed an identical petition with the Mono County Superior Court. The writ was denied and plaintiffs appeal. We stayed the activities of International for which the conditional use permit and subsequent building permit were issued pending our disposition of the matter.

## I

Mono County is situated in eastern California and is bordered on the east by the State of Nevada. The boundary on the west generally follows the crest of the Sierra Nevada mountain range. The county is primarily mountainous and open range land, almost all above 5,000 feet. It is California's third smallest county in population with 4,016 people. Although historically a county oriented to the economy of cattle and sheep ranching, nature's bountiful gifts of majestic mountains, lakes, streams, trees and wildlife have produced in the area one of the nation's most spectacularly beautiful and comparatively unspoiled treasures.

Mammoth Lakes, the section of Mono County immediately involved in this action, consists of some 2,100 acres of land surrounded by the Inyo National Forest. Plaintiffs assert that acute water and sewage problems will be created if International is permitted to construct its proposed condominium complex. Additional matters of concern include snow removal, police protection and the diminution of open space in general. Documents filed with defendant Commission prior to its decision indicate that the Commission may have considered in general the effect of the construction on the character and value of surrounding property, traffic, water and sewage facilities, snow removal, and fire and police protection.

The principal legal question that arises is whether the EQA applies to private activities for which a permit or other similar entitlement is required. This issue has been ventilated, not only by the named parties but also by the Attorney General and the Sierra Club as amici curiae. Defendants and International contend that even if their interpretation of the EQA does not prevail, plaintiffs should be denied relief for other reasons. Plaintiffs likewise assert additional grounds for setting aside the use and building permits. In view of the impact inherent in the initial judicial consideration of the EQA, we turn first to that issue.

---

[2]Friends of Mammoth is described as "an unincorporated association of hundreds of resident and nonresident owners of lots or mountain residences at Mammoth Lakes, Mono County, California."

## II

Though recognition of the problem in and out of government is more pervasive today, concern over violation of our environment is not entirely a contemporary phenomenon. Four decades ago Justice Holmes described a river as "more than an amenity, it is a treasure. It offers a necessity of life that must be rationed among those who have power over it." (*New Jersey* v. *New York* (1931) 283 U.S. 336, 342 [75 L.Ed. 1104, 1106, 51 S.Ct. 478].) Five years ago Justice Douglas spoke for the high court in admonishing the Federal Power Commission that the issue is not "whether the project will be beneficial to the licensee . . . . The test is whether the project will be in the public interest . . . in preserving reaches of wild rivers and wilderness areas . . . and the protection of wildlife." (*Udall* v. *FPC* (1967) 387 U.S. 428, 450 [18 L.Ed.2d 869, 883, 87 S.Ct. 1712].) More recently, a circuit court discussed statutes attesting "to the commitment of the Government to control, at long last, the destructive engine of material 'progress.' " The duty of the judiciary, it held, is to assure that important environment purposes, heralded in legislative halls, are not lost or misdirected in the vast hallways of administrative bureaucracy. (*Calvert Cliffs' Coord. Com.* v. *United States A. E. Com'n* (1971) 449 F.2d 1109, 1111 [146 App.D.C. 33].) The public interest involved in a challenge to administrative action need not be economic. (*Environmental Defense Fund, Incorporated* v. *Hardin* (1970) 428 F.2d 1093, 1097 [138 App.D.C. 391].)

The most recent declaration on the ecology ethic was the Supreme Court decision in *Sierra Club* v. *Morton* (1972) 405 U.S. 727 [31 L.Ed.2d 636, 92 S.Ct. 1361]. Though decided on an issue of standing to maintain the action, majority and dissenting opinions agreed on environmental protection principles. Justice Stewart wrote for the majority: "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." (405 U.S. at p. 734 [31 L.Ed.2d at p. 643, 92 S.Ct. at p. 1366].) In dissenting Justice Blackmun decried rigidity of the law that prevented reaching issues involving "significant aspects of a wide, growing, and disturbing problem, that is, the Nation's and the world's deteriorating environment with its resulting ecological disurbances." (405 U.S. at p. 755 [31 L.Ed.2d at p. 654, 92 S.Ct. at p. 1376].)

California's Environmental Quality Act of 1970 requires various state and local governmental entities to submit environmental impact reports before undertaking specified activity. These reports compel state and local agencies to consider the possible adverse consequences to the environ-

ment of the proposed activity and to record such impact in writing. In an era of commercial and industrial expansion in which the environment has been repeatedly violated by those who are oblivious to the ecological well-being of society, the significance of this legislative act cannot be understated. As section 21001, subdivision (g), clearly sets forth, the EQA requires "governmental agencies at all levels to consider qualitative factors as well as economic and technical factors and long-term benefits and costs and to consider alternatives to proposed actions affecting the environment."

Pursuant to section 21100, the environmental impact reports required by the act must set forth the following information:

"(a) The environmental impact of the proposed action.

"(b) Any adverse environmental effects which cannot be avoided if the proposal is implemented.

"(c) Mitigation measures proposed to minimize the impact.

"(d) Alternatives to the proposed action.

"(e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

"(f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented."

Under section 21100, the reports are required of "state agencies, boards and commissions"; section 21101 requires similar information with regard to federal projects "on which the state officially comments"; section 21102 requires an impact report before a state agency requests certain funds; section 21105 provides that a state official must include a report as part of "the regular project report used in the existing review and budgetary process." Finally sections 21150 and 21151 require local governmental entities to submit environmental impact reports prior to receiving certain state or federal funds or engaging in various activities.

Section 21151, the specific provision involved in the case at hand, states: "The legislative bodies of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any project they intend to carry out, which may have a significant effect on the environment, is in accord with the conservation element of the general plan. All other local governmental agencies shall make an environmental impact report on any project they intend to carry out which may have a significant effect on the environment and shall submit it to the appropriate local planning agency as part of the report required by Section 65402 of the Government Code."

■ Mono County does not yet have a conservation element of a general plan. Thus, the first sentence of section 21151 does not apply. Only if the second provision covers the issuance of a permit does the mandate of the act govern here. This determination necessarily turns on whether the term "project" as used in section 21151 includes private activity for which a government permit is necessary.

We begin our inquiry by noting that nowhere in the act is "project" defined. (Compare The Ventura-Los Angeles Mountain and Coastal Study Commission Act, Pub. Resources Code, § 22000 et seq., enacted at the same time as the Environmental Quality Act, ch. 2 of which sets forth definitions of terms used therein.) ■ Because of the failure of the Legislature to expressly delineate the meaning of "project," we must rely on a cardinal principle of statutory construction: that absent "a single meaning of the statute apparent on its face, we are required to give it an interpretation based upon the legislative intent with which it was passed." (*Benor* v. *Board of Medical Examiners* (1970) 8 Cal.App.3d 542, 546-547 [87 Cal. Rptr. 415] (hg. den.).)

■ In this instance our task has been considerably simplified because the Legislature has expressly set forth its intent in sections 21000 and 21001 of the act. These two provisions, captioned "Legislative intent" and "Additional legislative intent," contain no less than 14 references to the concern of the Legislature with the current deterioration of the environment. (See § § 21000, subds. (a)–(g); 21001, subds. (a)–(g).) An analytical reading of these sections leads to the ineluctable conclusion that the Legislature intended to include within the panoply of the act's provisions private activities for which a permit, lease or other entitlement is necessary.

The clearest manifestation of this intent can be found in section 21000, subdivision (g), which provides: "It is the intent of the Legislature that all agencies of the state government which *regulate* activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall *regulate* such activities so that major consideration is given to preventing environmental damage." (Italics added.) It is significant that *regulate* is the verb employed in this subdivision. (See also § 21107.) Its use demonstrates that the concern of the Legislature was not limited solely to activities which the government performs in a proprietary capacity. Instead the Legislature apparently desired to ensure that governmental entities in their *regulatory* function would determine that private individuals were not forsaking ecological cognizance in pursuit of economic advantage. One of the most common means by which a govern-

ment agency regulates private activity is through the granting or denial of a permit.

The Legislature also evidenced strong concern for the promulgation of standards by which environmental needs could be regularly included in the decision-making process. (See § 21001, subds. (f) and (g).) Because of the regular involvement of public entities in the issuance of permits it would appear that requiring "governmental agencies at all levels to develop standards and procedures necessary to protect environmental quality" (§ 21001, subd. (f)) necessarily includes not only situations in which the government itself engages in construction, acquisition or other development, but also those instances in which the state regulates private activity.

Other provisions in the EQA likewise support the conclusion that the Legislature intended to include the permit-issuing process as a governmental activity for which an environmental impact report is required. For example, section 21000, subdivision (e), states: "*Every citizen* has a responsibility' to contribute to the preservation and enhancement of the environment." (Italics added.) Such responsibility may never be exercised if the EQA is to apply only to activities in which the government is directly engaged. "Every citizen" is an unmistakable reference to private individuals as distinguished from government officials. Subdivision (f) of the same section provides: "The interrelationship of policies and practices in the management of natural resources and waste disposal requires systematic and concerted efforts by *public and private interests* to enhance environmental quality and to control environmental pollution." (Italics added.) Finally, section 21001, subdivision (d), provides: "Ensure that the long-term protection of the environment shall be the guiding criterion in *public decisions.*" (Italics added.) The reference in section 21000, subdivision (f), to "private interests" coupled with the "public decisions" phrase of section 21001, subdivision (d), contemplates as within the act the decision of a public agency to grant or deny private interests the opportunity to engage in enumerated activities.

In view of what appears to be a clear legislative mandate that the EQA be given a broad construction and that it apply to private actions for which a permit is necessary, we note parenthetically that the principal author of the EQA, Assemblyman John T. Knox, is on record as supporting such an interpretation. The legislator, in a sworn declaration, states that in authoring the bill and guiding it through the Legislature it "was my intent that the requirement of an environmental impact report extend to the situation where a state or local public agency by lease, permit, funding or comparable entitlement for use was authorizing or facilitating a private undertaking as long as there was a significant impact upon the environ-

ment. This includes situations such as zoning changes, conditional use permits and building permits. I communicated this intent to other legislators in the course of the legislative process . . . ." (Declaration by John T. Knox, Feb. 1972, plaintiffs' opening brief, appendix C.)

Defendants and International seek to rebut the significance of the Knox declaration by offering a declaration of Assemblyman Carley V. Porter in which he opines that the act does not apply to private activities for which a permit was necessary. (Declaration of Carley V. Porter, Apr. 11, 1972, appendix to defendants' answer to briefs of amici curiae; also see Interim Guidelines for the Preparation and Evaluation of Environmental Impact Statements Under the California Environmental Quality Act of 1970, Office of the Secretary for Resources (draft of Apr. 28, 1972).)

That two legislators report contradictory legislative intent fortifies judicial reticence to rely on statements made by individual members of the Legislature as an expression of the intent of the entire body. (See *Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 881 [95 Cal.Rptr. 1, 484 P.2d 1345]; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 603 [45 Cal.Rptr. 512] (hg. den.).) Other extrinsic aids to determine legislative intent are generally more persuasive.

Defendants and International also submit a statement by a former consultant to the Assembly Select Committee on Environmental Quality. The consultant, Robert L. Jones, conceded that it was only his "impression" that the EQA was limited to activities undertaken directly by governmental bodies. (Testimony of Robert L. Jones before Senate Committee on Natural Resources and Wildlife, on the Administration of the Environmental Quality Act of 1970 and Related Acts, Dec. 16, 1970, at pp. 3-5.)[3] More significant, perhaps, is the preface to his remarks in which he defers for an authoritative interpretation of the act to "the Legislative [Counsel] or the Attorney General." (*Id.* at p. 2.) To compound the conflict of extrajudicial opinions, the Attorney General has taken the position that the act does apply to private activity (Attorney General of the State of California, In re Proposed Guidelines for the Preparation and Evaluation of Environmental Impact Statements under the California Environmental Quality

[3]In a subsequent letter Jones first indicated that it was his view that the EQA "probably" did not apply to private activities. He further stated, however, "In the policy section of AB 2045 [the act's bill number], there are however, two sections that certainly indicate legislative policy on application of environmental impact studies on private land. The first is Section 21000(g) and the second is Section 21107. Considering these two sections together, I believe it can be inferred that all state agencies, boards and commissions who regulate private activities are responsible for insuring environmental protection when these activities are carried out." (Letter from Robert L. Jones to Hon. Peter F. Schabarum and Carley V. Porter, Nov. 15, 1971.)

Act of 1970, at p. 9; amicus curiae brief of the State of California filed herein, at pp. 15-26) whereas the Legislative Counsel has concluded that it does not (letter from George H. Murphy, Legislative Counsel, to Hon. Carley V. Porter, Nov. 23, 1971, appendix to defendants' answer to briefs of amici curiae, exh. 3). We observe, however, that the cursory three-page letter of the Legislative Counsel was not designed to be an in-depth analysis of the type included in the Attorney General's petition and brief which together number some 60 pages.

In resolving the conflict on intent, as we must, we conclude that the Legislature intended the EQA to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language. We also conclude that to achieve that maximum protection the Legislature necessarily intended to include within the operation of the act, private activities for which a government permit or other entitlement for use is necessary.

### III

■ Defendants and International contend that notwithstanding the broad language of the act, the Legislature did not effectuate this avowed intent in section 21151. They point to the use of the word "project" and the clause that follows it—"they [i.e., local governmental agencies] intend to carry out." Defendants and International maintain that in this context "project" is coterminous with "public works."

As noted previously, the EQA does not attempt to define "project." Because the legislative intent provisions dictate that we give a broad interpretation to the act's operative language, we begin from that vantage point. ■ Once a particular legislative intent has been ascertained, it must be given effect " 'even though it may not be consistent with the strict letter of the statute.' " (*Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324].) ■ As we stated nearly a half century ago in *In re Haines* (1925) 195 Cal. 605, 613 [234 P. 883]: " 'The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' "

■ Our task then is to determine whether the word "project" is "sufficiently flexible" so as to effectuate the broad legislative intent that private activities should be brought within the ambit of the act. We may not, of course, give an unreasonable construction to the statute. (See *Cedars*

*of Lebanon Hosp.* v. *County of L. A.* (1950) 35 Cal.2d 729, 735 [221 P.2d 31]; *Dept. of Motor Vehicles* v. *Ind. Acc. Com.* (1948) 83 Cal. App.2d 671, 677 [189 P.2d 730].)

In interpreting "project" our task has been made difficult both by the dictionary definition of the word and the use of "project" and similar terms in the act itself. Webster defines project as a "plan or design . . . scheme . . . proposal . . . ." (Webster's New Internat. Dict. (3d ed. 1961) p. 1813.) Such synonyms provide little interpretative aid. Furthermore the act itself refers to "projects" in some instances (see, e.g., §§ 21100, 21150, 21151) and to "actions" and "proposals" in other instances (see, e.g., § 21100, subds. (a), (b), (d), (f)), devising no neat categories in which to place the several similar terms.

■ With this in mind, we resort to the rule declared in *People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543-544 [72 Cal.Rptr. 790, 446 P.2d 790]: A principle "which must be applied in analyzing the legislative usage of the word 'project,' is that 'the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is enlarged or restricted and especially in order to avoid absurdity or to prevent injustice.' " ■ Since neither the dictionary definition nor the EQA itself provides us with a tool to use in interpreting "project" we turn to the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) for guidance.

The National Environmental Policy Act (NEPA) was signed into law January 1, 1970. Interim guidelines written by the President's Council on Environmental Quality were promulgated on April 30, 1970. (35 Fed.Reg. 7390.) (They were superseded by the final federal guidelines on April 23, 1971 (36 Fed.Reg. 7724).) The EQA was passed by the Legislature on August 21, 1970 (Assembly Final Calendar (1970 Reg. Sess.) at p. 637), and was signed by the Governor on September 18, 1970 (*id.*). Not only does the timing and the titles of the two acts tend to indicate that the EQA was patterned on the federal act, the key provision of the two acts, the environmental impact report, is the same. (Compare 42 U.S.C. § 4332, subd. (2)(C) with Pub. Resources Code, § 21100; see also Pub. Resources Code, §§ 21101, 21102, 21105, 21150, 21151.) Indeed, much of the phraseology of the EQA is either adopted verbatim from or is clearly patterned upon the federal act.[4] As one commentator has ob-

---

[4]Compare Pub. Resources Code, § 21100, subd. (a), and 42 U.S.C. § 4332 (2)(C)(i); Pub. Resources Code, § 21100, subd. (b), and 42 U.S.C. § 4332

served, the EQA is "much like the Federal NEPA." (Powell, *The Courts as Protectors of the Environment* (1972) 47 L.A. Bar Bull. 215, 218.)

Accordingly, in construing "project" in the EQA, the definition of that word in the federal act and regulations becomes relevant. It is significant to note, in this regard, the Court of Appeals for the District of Columbia has emphasized that in construing the federal act the judicial role is active and that the NEPA must be interpreted broadly. (See *Calvert Cliffs' Coord. Com.* v. *United States A. E. Com'n, supra,* 449 F.2d 1109, 1111.) This is consonant with the mandate of the California Legislature that the EQA be given a liberal construction.

Section 102 of the NEPA, the act's principal substantive provision, uses the word "action" as opposed to "project." (42 U.S.C. § 4332, subd. (2)(C).) The Council on Environmental Quality first defined "action" in the interim guidelines it issued some four months prior to the enactment of the EQA. In view of the similarity between the federal and state acts, the Legislature obviously was aware of the federal definitions when the EQA was passed. (Cf. § 98, Assem. Bill 681, a bill which would add § 21109 to the Pub. Resources Code, introduced Mar. 2, 1972.) Accordingly, the definitions promulgated by the Council on Environmental Quality are helpful to an understanding of the subsequent California use of the word "project." The interim guidelines, ultimately adopted without significant change insofar as relevant here in the final guidelines, provide the following:

"5. *Actions included.* . . .

"(a) 'Actions' include but not limited to:

"(i) Recommendations or reports relating to legislation and appropriations;

"(ii) Projects and continuing activities;

"— Directly undertaken by Federal agencies;

"— Supported in whole or in part through Federal contracts, grants, subsidies, loans or other forms of funding assistance;

---

(2)(C)(ii); Pub. Resources Code, § 21100, subd. (d), and 42 U.S.C. § 4332(2)(C) (iii); Pub. Resources Code, § 21100, subd. (e), and 42 U.S.C. § 4332(2)(C)(iv); Pub. Resources Code, § 21100, subd. (f), and 42 U.S.C. § 4332(2)(C)(v); Pub. Resources Code, § 21000, subd. (e), and 42 U.S.C. § 4331(c); Pub. Resources Code, § 21001, subd. (e), and 42 U.S.C. § 4321; Pub. Resources Code, § 21001, subds. (f) and (g), and 42 U.S.C. § 4332(2)(B) and (2)(D); Pub. Resources Code, §§ 21104 and 21105 and 42 U.S.C. § 4332(2)(C); Pub. Resources Code, § 21107 and 42 U.S.C. § 4333.

"— Involving a Federal lease, permit, license, certificate or other entitlement for use;

"(iii) Policy—and procedure-making." (35 Fed.Reg. 7390, 7391; see also 36 Fed.Reg. 7724, 7725.)

Arguably "actions" is broader than "projects," even though the EQA tends to use the two words interchangeably in section 21100.[5] However, it is crucial that "actions," under the federal guidelines, is divided into three categories, one of which is "projects." It is under "projects" as a subclass of "actions" that "lease, permit, license, certificate, or other entitlement for use" is included.[6]

In view of the relationship between the two acts and the fact that both are subject to a broad judicial interpretation, it is manifest that the word "project" as used in section 21151 and other provisions of the EQA includes the issuance of permits, leases and other entitlements. Accordingly, we hold that in the case at bar defendants were required to consider whether the proposed condominium construction "may have a significant effect on the environment" (§ 21151; see fn. 9, *infra*) and, if so, to prepare an environmental impact report *prior to* the decision to grant the conditional use and building permits. (Cf. *Greene County Planning Board v. Federal Power Com'n* (2d Cir. 1972) 455 F.2d 412, 418-421.)

## IV

Defendants and International contend that since "project" is followed by the phrase "they intend to carry out," section 21151 can only be interpreted as referring to a public works type project "to be carried out," i.e., constructed, acquired or developed, by the government. However, having interpreted the word "project" broadly to include private activity for which a permit is necessary, certainly the granting or denying of a permit is an act which a governmental authority "carries out." Accordingly, we construe the phrase following "project" to mean only that before an environmental impact report becomes required the government must

---

[5]Section 21100 requires that the following shall be included "in any report on any *project* they propose to carry out . . .: (a) The environmental impact of the proposed *action*. . . . [¶] (d) Alternatives to the proposed *action*. . . . [¶] (f) Any irreversible environmental changes which would be involved in the proposed *action* should it be implemented." (Italics added.) (See also § 21001, subd. (g).)

[6]We note that the second category is actually titled "projects and continuing activities." The former would appear to apply to activities the duration of which is relatively settled, whereas the latter appears to cover those activities which might continue for some unknown period of time. The differences between the two subcategories do not involve any distinction between public and private activities.

have some minimal link with the activity, either by direct proprietary interest or by permitting, regulating, or funding private activity.[7]

Moreover, to limit the operation of the EQA solely to what are essentially public works projects would frustrate the effectiveness of the act. It is undisputed that the Legislature intended that environmental considerations play a significant role in governmental decision-making (see §§ 21000, 21001) and that such an intent was not to be effectuated by vague or illusory assurances by state and local entities that the effect of a project on the environment had been "taken into consideration."[8] To read "project they intend to carry out"—the cornerstone of many of the act's provisions—as limited to public works projects would render meaningless much of the legislative intent sections that contemplate regulation of private activity, for none of the act's other substantive provisions more clearly relate to private actions. And to exclude all private activity from being covered by the act would be inconsistent with the broad legislative intent appearing therein. More specifically, if private activities for which a permit

---

[7]Regulation of private activity by a public agency can be more vividly seen as a project which the agency intends to "carry out" in those instances in which the agency maintains regulatory control over the project throughout its lifetime. (Cf. *Orange County Air Pollution Control Dist.* v. *Public Util. Com.* (1971) 4 Cal.3d 945, 948 [95 Cal.Rptr. 17, 484 P.2d 1361].)

[8]The fact that defendants in the instant action allegedly considered the effect of the proposed construction on the character and value of surrounding property, traffic, water and sewage facilities, fire and police protection, snow removal and the ecology in general, does not, in any sense of the term, "substantially comply" with the environmental impact report requirements. Whether on different facts the requirements of this act can be satisfied by substantial rather than literal compliance is a question we do not here reach.

The impact report must be specially prepared in written form before the governmental entity makes its decision. This will give members of the public and other concerned parties an opportunity to provide input both in the making of the report and in the ultimate governmental decision based, in part, on that report.

The report, of course, must satisfy the elements set forth in section 21100. For example, subdivision (b) requires that "[a]ny adverse environmental effects which cannot be avoided if the proposal is implemented" be included in the report. There is no requirement that these adverse effects be considered "significant" before they are to be listed. Subdivisions (c) and (d) require that mitigation measures and alternatives to the proposed action be considered. Obviously if the adverse consequences to the environment can be mitigated, or if feasible alternatives are available, the proposed activity, such as the issuance of a permit, should not be approved. In making these determinations concrete concepts, not mere aphorisms or generalities, must be considered. Finally, subdivision (f) requires the entity to include in the report "[a]ny irreversible environmental changes which would be involved in the proposed action should it be implemented." As in subdivision (b), there is no requirement that these changes be assessed as "significant" before they are to be included in the report.

The report, therefore, is to contain substantially greater analysis of the effect of the proposed activity on the environment and the possible mitigation devices and alternatives than can be achieved simply through testimony followed by a naked conclusion that the environment will not be harmed by the project.

is required were exempted from the operation of the act, projects with admittedly deleterious ecological consequences would be covered only if construction, acquisition or other development were undertaken by the governmental authority but not if the same authority allowed private enterprise to engage in the identical activity. The incongruity of such interpretation would be most vivid in the less populous counties, such as Mono, which because of limited economic capabilities might never engage in massive public works projects significantly affecting the environment, but could achieve the same result by permitting, licensing, or partially funding private activities.

To further demonstrate the paradoxical position advanced by defendants and International, generally the sparsely populated counties in which massive public works projects are less likely because of the financial burden are the counties with significant natural resources and wildlife most in need of protection. While the act applies to large and small counties, and to urban and rural areas alike, certainly the protection afforded by the EQA would be substantially diminished in an area where it may be most needed if the act were to be interpreted to cover only public works projects.

Defendants, nevertheless, assert that the legislative history of the EQA indicates that the word "project" does not apply to the issuance of a permit. They cite the original language of AB 2045, as introduced in the Assembly on April 21, 1970. At that time, section 21151 would have applied to "[a]ll local governmental agencies . . . for any *program* carried out by them." (Italics added.) An amendment on May 26 made the bill more specific, setting up three classifications of local governmental entities: (1) the legislative body of all cities and counties with a conservation element of a general plan; (2) local governmental units without a conservation element; and (3) all other local governmental agencies. The language "for any program carried out by them" was retained for all three categories except for minor grammatical changes.

A subsequent amendment introduced in the Senate on August 4, 1970, distinguished between the three categories by making the act operative for group one entities for "any *project* or *change in zoning* they intend to carry out"; and for group two entities for "any *project* they intend to carry out"; yet retaining for group three the "any *program* they intend to carry out" wording. (Italics added.) On August 14, the proposed section 21151 was amended once again, this time eliminating altogether the second category; separating the "project" and "change in zoning" provisions of the first category into two sentences instead of one; and changing "program" in the third category to "project." The final amendment, on August

20, deleted the sentence pertaining to "change in zoning" and retained the "project" requirement for the categories designated above as groups one and three. The second category was not reinstituted. It was with this language that the bill became law.

It is possible that these intricate semantic changes enroute to final enactment were not without significance. Defendants insist that the amending process has been a narrowing one. We do not agree. Leaving aside the several intermediate alterations, we note in essence the change was from "program" to "project." It may be fairly said that the former entails more general planning, and policy and procedure-making, similar to that described in the NEPA guidelines. (See 35 Fed.Reg. 7390, 7391, 5(a)(iii); see also 36 Fed.Reg. 7724, 5(a)(iii), both *supra*.) Conversely, "project" appears to emphasize activities culminating in physical changes to the environment, changes which were of paramount interest to the Legislature. (Cf. § 21102.) It appears that the Legislature in its amendments to Assembly Bill 2045 was influenced by the issuance of the interim federal guidelines published subsequent to the introduction of Assembly Bill 2045 but prior to its final passage. Those guidelines used the word "project" rather than "program." Thus the Legislature appears to have intended, in order to prevent confusion, to use the same broad terminology in effect under federal law rather than to adopt an entirely different set of phrases of its own.

International next insists that section 21151 does not apply to private activity because of its clause that requires local agencies to submit an environmental impact report "to the appropriate local planning agency as part of the report required by Section 65402 of the Government Code." Section 65402 provides that counties, cities and local agencies shall submit a report to planning agencies pursuant to proposed acquisition of real property or construction of public buildings and structures so that a determination can be made as to whether the proposal is consistent with their respective general plans. (See Gov. Code, § 65100 et seq., especially §§ 65350-65402.) It is contended that since the Government Code provision applies only to development or acquisition by municipal entities, it would be illogical to require an impact report on private activities to be filed in conjunction with some mythical report on a public works project. Accordingly, they argue, section 21151 must apply only to the type of public works projects contemplated by Government Code section 65402 and not to private activity for which a permit is necessary.

The reading proposed by International elevates what appears to be simply a directory measure to far greater significance than is warranted. We have reviewed the broad legislative intent of the EQA and the close

relationship between that act and the federal NEPA. Both compel the conclusion that private activities involving the issuance of a permit are within the scope of the EQA. The use of these reports by the planning agencies mentioned in Government Code section 65402 is secondary to the principal purpose of section 21151, which is to compel local governments to study and record the environmental implications of proposed activities before they are acted upon. This broad purpose cannot be frustrated by procedural details surrounding filing of the reports.

The NEPA provides that copies of all impact statements prepared by the various federal agencies are to be made available to the Council on Environmental Quality, among others, and must "accompany the proposal through the existing agency review processes." (42 U.S.C. § 4332 (2)(C).) The EQA similarly directs the Office of Planning and Research to "coordinate the development of objectives, criteria, and procedures to assure the orderly preparation and evaluation of environmental impact reports . . . ." (§ 21103.) The act also requires consultation with the various governmental entities (§§ 21103, 21104) and directs the impact reports be included "as a part of the regular project report used in the existing review and budgetary process" (§ 21105).

On the basis of similar directory provisions in the EQA and NEPA, the command in section 21151 that environmental impact reports be submitted with the reports required by section 65402 of the Government Code is not meant to limit the breadth of the section. Instead, it is an attempt to integrate such impact reports into any existing reporting procedure in order to avoid unnecessary duplication, confusion and cost. Accordingly, projects for which a Government Code section 65402 report must be filed must also contain an environmental impact report. Those projects, such as that involved here, for which no section 65402 report is necessary, must nonetheless be preceded by an environmental impact report pursuant to section 21151.[9]

---

[9]"Statutes," wrote Justice Frankfurter in *United States* v. *Shirey* (1959) 395 U.S. 255, 260 [3 L.Ed.2d 789, 793, 79 S.Ct. 746], "are not inert exercises in literary composition. They are instruments of government, and in construing them 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.' [Citation.] This is so because the purpose of an enactment is embedded in its words even though it is not always pedantically expressed in words." Judge Learned Hand described interpretation of statutes as "the art of proliferating a purpose." (*Brooklyn Nat. Corp.* v. *Commissioner of Int. Rev.* (2d Cir. 1946) 157 F.2d 450, 451.)

We cannot, as respondents would have us do, indulge in an inert exercise, leaning heavily on isolated words and phrases and remaining oblivious to the express legislative intent to protect society against environmental blight. Nor are we impressed with the significance of legislative proposals introduced in March of 1972, long after this permit was issued and the lawsuit instituted, since here the post facto legislative amendments not only express the interpretation of "project" which we have declared, but *expand* the act to apply beyond "projects" to "major actions."

## V

Aside from the question of the proper construction of the Environmental Quality Act the parties make several other contentions to which we now turn.

Defendants and International first assert that plaintiffs did not properly exhaust their administrative remedies prior to seeking judicial relief. Section 1209 of the Mono County Zoning Ordinance provides: "B. Any interested person . . . not satisfied with the decision of the Commission on any use permit . . . may, within fifteen (15) days . . ., appeal in writing to the Board [of Supervisors]." Neither plaintiff Friends of Mammoth nor plaintiff Griffin filed an appeal pursuant to section 1209. An appeal was filed by individuals Frederick Schaeffer, Richard Young, Donald J. LaCasse and Robert H. Meyer, all property owners in the Mammoth Lakes area.

Plaintiffs allege that Messrs. Schaeffer and Young are members of the class represented by plaintiff Griffin in this class action. Defendants and International do not controvert this allegation. Instead they argue that Friends of Mammoth and Griffin, and not members of the representative class, must personally exhaust their administrative remedies. Otherwise, they contend, a plaintiff could avoid the exhaustion doctrine simply by including within the class one individual who had pursued his administrative remedies but did not bring judicial action as a named plaintiff.

This assertion proves too much. First of all, the fact that an individual pursued administrative remedies would not, as a matter of course, entitle him to be included in a subsequent class action. Exhaustion of administrative remedies does not necessarily provide the "well defined community of interest in the questions of law and fact involved affecting the parties to be represented" required in class actions. (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 704 [63 Cal.Rptr. 724, 433 P.2d 732]: see also 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 181, at pp. 1853-1854.) However, in most instances those individuals who have a sufficient interest in the subject matter to seek administrative review will possess the community of interest with others to justify inclusion in the group represented in a subsequent class action. But this conclusion defeats the very argument defendants advance: that the Board is entitled to learn the contentions of interested parties before litigation is instituted. If those unnamed plaintiffs in the class suit have previously sought administrative relief they will have expressed the position of the representative plaintiff in the class suit, and the Board will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so.

Messrs. Schaeffer and Young apparently desire to be represented by plaintiff Griffin. They have not sought to be excluded from the class. (Cf. *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 821 [94 Cal.Rptr. 796, 484 P.2d 964].) Since two plaintiffs, albeit unnamed plaintiffs, have previously appeared before the Board, the policies of the exhaustion doctrine have been fulfilled. Under these circumstances, the doctrine cannot be employed to bar a suit by a class not organized at the time of the administrative appeal. Defendant Board has had the opportunity to hear arguments of interested property owners Schaeffer and Young, along with two others who also appealed. Now several interested property owners, including Schaeffer and Young, represented here by named plaintiff Griffin, seek a judicial determination of the legality of that decision. Nothing more could effectuate the policy of the exhaustion doctrine. To require plaintiff Griffin to have personally appeared, in addition to the others, or to require Schaeffer and Young to be named plaintiffs (cf. *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 872 [97 Cal.Rptr. 849, 489 P.2d 1113]) would serve no additional useful purpose.

 Defendants and International next insist that plaintiffs failed to seek timely relief from the decision of defendant Board giving final approval of the permit. Section 1213 of the zoning ordinance provides that decisions of the Board "shall be final for all purposes unless a court review thereof is sought within thirty (30) days after such decisions become final." Defendant Board upheld the decision of defendant Commission on June 14, 1971. On July 12, within the 30-day period, plaintiffs sought a writ of administrative mandamus in the Court of Appeal, Third District. On July 15, the Court of Appeal denied the writ but "without prejudice to the filing of proceedings in the Superior Court." On July 19, 35 days after the decision by the Board, plaintiffs filed an identical petition for a writ of administrative mandamus in superior court. Defendants and International assert that because the period between June 14 and July 19 is greater than the 30-day allotment provided by ordinance, plaintiffs cannot seek judicial review. We reject this contention.

It must be noted at the onset that judicial relief was "sought" (in the words of the ordinance) in the Court of Appeal within 30 days of the Board's decision. Relief was denied there but it was denied "without prejudice." This term usually indicates that no decision on the merits has been made: "The rule is well settled that a denial by this or the appellate court of an application for a writ without opinion 'is not res judicata of the legal issues presented by the application unless the *sole possible* ground of the denial was that the court acted on the merits, or unless it affirmatively appears that such denial was intended to be on the merits.' "

(*Hagan* v. *Superior Court* (1962) 57 Cal.2d 767, 770 [22 Cal.Rptr. 206, 371 P.2d 982]; see *Imperial Land Co.* v. *Imperial Irrigation Dist.* (1913) 166 Cal. 491, 492 [137 P. 234].)

Defendants and International contend that denying the writ without prejudice does not toll or extend the statute of limitations of 30 days. Article VI, section 10, of the state Constitution gives original jurisdiction to the Supreme Court, Courts of Appeal, superior courts, and their judges in "proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition." Rule 56(a) provides: "If the petition might lawfully have been made to a lower court in the first instance, it shall set forth the circumstances which, in the opinion of the petitioner, render it proper that the writ should issue originally from the reviewing court . . . ." In his comments to the rule, Witkin states: "In form this is a rule of *pleading*; in effect, however, it expresses the policy of the Supreme Court and courts of appeal to refuse to exercise their original jurisdiction in the first instance, unless the circumstances are exceptional." (5 Witkin, Cal. Procedure, *supra,* Extraordinary Writs, § 114, at p. 3889; see also *Cohen* v. *Superior Court* (1968) 267 Cal.App.2d 268, 270 [72 Cal.Rptr. 814].)

The foregoing policy seeks to encourage the filing of petitions for extraordinary writs in the superior court. It does not follow, however, when such policy is effectuated by an appellate court order denying relief without prejudice that petitioners should be denied a hearing on the merits by a myopic reading of the abbreviated statute of limitations. An equally strong public interest was formulated by the court in *Morgan* v. *Somervell* (1940) 40 Cal.App.2d 398, 400 [104 P.2d 866]: "It is in furtherance of a policy frequently exemplified in legislative acts to enable a party who, like the plaintiffs in the present proceeding, has seasonably filed a cause of action, to try it upon its merits, notwithstanding defects in the form or substance of pleadings, error in the remedy sought, or *mistake in the tribunal invoked.*" *Morgan* involved the *transfer* of a cause of action pursuant to Code of Civil Procedure section 396. Thus it is factually distinguishable from the case at bar. The policy explicated in *Morgan,* however, applies here. Defendants and International, having been put on notice of the litigation, were not prejudiced in any manner by the Court of Appeal's denial of the petition and the subsequent prompt refiling in superior court.

We conclude that plaintiffs complied with the statute of limitations by filing a petition for writ of mandamus in the Court of Appeal within the statute of limitations contained in the Mono County Zoning Ordinance and upon denial without prejudice by refiling promptly in the superior court.

We now turn to two final contentions raised by plaintiffs. Plaintiffs insist that the granting of the permit must be set aside on the following grounds in addition to defendants' failure to comply with the EQA: (1) defendants have not made written findings as required by local ordinance; (2) the evidence did not support the granting of the permits and they must be set aside as a matter of law.

■■■ Section 1201 of the Mono County Zoning Ordinance provides, in pertinent part: "USE PERMITS. Use permits may be granted by the Planning Commission only when it is *found* that. . . ." (Italics added.) The question involved here, then, is whether the use of the word "found" requires specific written findings. In *Schumm* v. *Board of Supervisors* (1956) 140 Cal.App.2d 874, 878 [295 P.2d 934], the court was required to interpret an ordinance which provided: " 'In recommending the approval of any use permit the Planning Commission shall find . . . .' " The court held that written findings were not required. (140 Cal.App.2d at pp. 880-881.) However, in *Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 767 [59 Cal.Rptr. 146, 427 P.2d 810], we said that an ordinance which required the zoning administrator to specify "in his findings the facts which establish . . ." (66 Cal.2d at p. 771, fn. 3) necessitated written findings and that the normal presumption of necessary findings "does not apply to agencies which must expressly state their findings and must set forth the relevant supportive facts." (66 Cal.2d at p. 773; cf. *Siller* v. *Board of Supervisors* (1962) 58 Cal.2d 479, 484 [25 Cal.Rptr. 73, 375 P.2d 41].)

The proper interpretation of ordinances using the word "findings" or "found" naturally depends on the intent of the body adopting those ordinances. In light of the statewide concern expressed by the Legislature for written findings in the field of ecology, as evidenced by the EQA's impact *report,* the proper construction of the words "findings" or "found" requires a written statement of the supportive facts on which the agency has made its decision. Since this report involves the assessment of a myriad of elements (see § 21100) it obviously includes all those facts which would be contained in written findings if such findings were required by the ordinance. Accordingly, the written report affords plaintiffs the same benefits that would be achieved by written findings pursuant to the ordinance, and we therefore hold in this case no additional written findings in the orthodox sense are required.

Plaintiffs finally contend that there was insubstantial evidence to support the issuance of the permits and that they must be set aside as a matter of law. In view of our conclusion that the EQA applies to private activity, and the fact that such a holding will necessitate further proceedings by the defendants, we find it unnecessary to analyze the weight of the evidence.

## VI

We emphasize that by the terms of the act an environmental impact report is required only for a project "which may have a significant effect on the environment" (§ 21151; see also §§ 21100, 21101, 21102, 21150). In the case at bar the issue whether the proposed project of International might have such an effect was not resolved by either the defendants or the superior court, presumably because it was believed the project was not covered by the act in any event. It would be inappropriate for this court to determine the issue in the first instance, and we therefore leave the matter to the defendants' future proceedings.

We recognize that the reach of the statutory phrase, "significant effect on the environment," is not immediately clear. To some extent this is inevitable in a statute which deals, as the EQA must, with questions of degree. Further legislative or administrative guidance may be forthcoming on this point among others. But the courts, for their part, are limited to discharging their constitutional function of deciding the cases that are brought before them. As with other questions of statutory interpretation, the "significant effect" language of the act will thus be fleshed out by the normal process of case-by-case adjudication.

Two general observations, nevertheless, may be made at this time. On the one hand, in view of the clearly expressed legislative intent to preserve and enhance the quality of the environment (§§ 21000, 21001), the courts will not countenance abuse of the "significant effect" qualification as a subterfuge to excuse the making of impact reports otherwise required by the act. In this connection we stress that the Legislature has mandated an environmental impact report not only when a proposed project *will* have a significant environmental effect, but also when it "may" (§§ 21101,

21150, 21151) or "could" (§§ 21100, 21102) have such an effect. On the other hand, ccmmon sense tells us that the majority of private projects for which a government permit or similar entitlement is necessary are minor in scope—e.g., relating only to the construction, improvement, or operation of an individual dwelling or small business—and hence, in the absence of unusual circumstances, have little or no effect on the public environment. Such projects, accordingly, may be approved exactly as before the enactment of the EQA.

In their petition for rehearing respondents and amici curiae assert that in the period between November 23, 1970, when the EQA went into effect, and September 21, 1972, the date of our decision herein, governmental agencies approved private projects, now either in progress or completed, without requiring the preparation of environmental impact reports, in the erroneous but good faith belief that such projects were exempt from the act. To avoid possible hardship to parties who have relied on permits thus issued, we are asked to make our decision prospective only.

We see no need for such a drastic step. In the minority of cases in which impact reports should have been prepared, the appropriate statutes of limitations will govern. As noted herein (p. 268, *ante*), the Mono County Zoning Ordinance declares a 30-day statute of limitations for seeking judicial review of a decision of defendant Board. If this provision is typical of such ordinances, very few if any of the projects approved during the 22-month period in question will still be subject to attack. And if a substantially longer statute of limitations is provided in any case, similar protection may be afforded by invoking the doctrine of laches.

We are also asked to stay the effective date of our decision in order to allow additional time, inter alia, for governmental agencies to draw up guidelines and develop procedures for applying the EQA to private projects as defined herein. Again we perceive no real necessity for such a departure from normal practice. In extraordinary circumstances we have authorized a delay in the effectiveness of a decision of this court when its immediate implementation would have been virtually impossible. (See, e.g., *Young* v. *Gnoss* (1972) 7 Cal.3d 18, 28 [101 Cal.Rptr. 533, 496 P.2d 445]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 618-619 [96 Cal.Rptr. 601, 487 P.2d 1241].) For the reasons given above, however, we expect that the majority of the private projects for which governmental approval will be sought in the future will present no risk of significant environmental effect and therefore will not require impact reports in any event. With respect to the remainder, we point out that the EQA has been in effect since November 23, 1970, and many of the questions here raised as to the method of complying

with the act in the case of private projects could also have arisen during the past 22 months in the case of public projects. We must therefore presume that governmental agencies charged with responsibilities under the act have been performing their duties (Civ. Code, § 3548) and can now draw upon their planning and experience in the public sector to aid in solving whatever problems they may have in the private sector. To the extent such planning and experience prove inadequate to the task at hand, we do not doubt that with the good will and cooperation of all concerned appropriate new guidelines and procedures can be promptly devised. And if some delays nevertheless ensue in processing applications for certain private projects which threaten to have a significant effect on the environment, it should be remembered that such delays are implicit in the Legislature's primary decision to require preparation of a written, detailed environmental impact report in precisely those cases.

The order appealed from is reversed, with directions to grant a peremptory writ of mandate ordering defendants to set aside the issuance of the conditional use and building permits.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., and Burke, J., concurred.

**SULLIVAN, J.**—I dissent. The opinion of the majority, discarding settled principles of statutory construction and distorting the plain meaning of common English words, adopts an interpretation of the pertinent section of the Environmental Quality Act of 1970 (EQA) (Pub. Resources Code, §§ 21000-21151)[1] which in my opinion is not legally supportable. The desired end arrived at by the majority cannot justify such a means. "This court has no power to rewrite the statute so as to make it conform to a *presumed* intention which is not expressed." (*Seaboard Acceptance Corp.* v. *Shay* (1931) 214 Cal. 361, 365 [5 P.2d 882]; italics added.)

The crucial question before us is, of course, whether Mono County must prepare an environmental impact report, pursuant to section 21151, before it grants a conditional use or building permit for International's proposed development at Mammoth Lakes. The answer to this question depends in turn on the resolution of a problem of statutory construction—whether the phrase "any project they intend to carry out" (§ 21151) includes within its scope a *private* development for which a governmental permit is required. As will appear, I conclude that the applicable rules of interpretation compel a negative answer.

Section 21151 provides: "The legislative bodies of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any project they intend to carry out, which may

---

[1]Hereafter, unless otherwise indicated, all section references are to the Public Resources Code.

have a significant effect on the environment, is in accord with the conservation element of the general plan. All other local governmental agencies shall make an environmental impact report on any project they intend to carry out which may have a significant effect on the environment and shall submit it to the appropriate local planning agency as part of the report required by Section 65402 of the Government Code."

In order to construe the statutory phrase "any project they intend to carry out," it is fundamental that the court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672] and cases there cited.) Our endeavor must be to produce a "reasonable result consistent with legislative purpose . . . ." (E.g., *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 620 [7 Cal.Rptr. 129, 354 P.2d 657].)

We pointed out many years ago that in ascertaining the will of the Legislature, "[t]he court turns first to the words themselves for the answer. It may also properly rely on extrinsic aids . . . . Primarily, however, the words, in arrangement that superimposes the purpose of the Legislature upon their dictionary meaning, stand in immobilized sentry, reminders that whether their arrangement was wisdom or folly, it was wittingly undertaken and not to be disregarded. [¶] . . . If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citations.] Certainly the court is not at liberty to seek hidden meanings not suggested by the statute or by the available extrinsic aids. [Citation.]" (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182-183 [217 P.2d 1]; see also *In re Miller* (1947) 31 Cal.2d 191, 198-199 [187 P.2d 722]; Code Civ. Proc., § 1858.)

In giving effect to this canon of literal construction we must interpret statutes "according to the usual, ordinary import of the language employed in framing them." (*In re Alpine* (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500]; see also *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; *Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 203 [339 P.2d 801].) The sweep of the statute should not be enlarged by introduction of language which the Legislature has overtly left out. (E.g., *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 632 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

I recognize, of course, that an enactment must be interpreted so as to harmonize its various parts, by considering the particular clause or section in the light of the statutory framework as a whole (*Select Base Materials*

v. *Board of Equal., supra,* 51 Cal.2d 640, 645; *Stafford* v. *L.A. etc. Retirement Board* (1954) 42 Cal.2d 795, 799 [270 P.2d 12]); but a special or particular provision qualifies the general, especially where the provisions are inconsistent and cannot be reconciled (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723]; *Rose* v. *State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505]; *In re Marquez* (1935) 3 Cal.2d 625, 629 [45 P.2d 342]; Code Civ. Proc., § 1859) and where the particular provision is later in point of position (*Hartford Acc. etc. Co.* v. *City of Tulare* (1947) 30 Cal.2d 832, 835 [186 P.2d 121]).

Applying these general principles in construing the phrase "any project they intend to carry out," I begin with the words themselves. Since no definitions are provided in the EQA, our first guide is the dictionary. Webster's Third International Dictionary, Unabridged (1963) defines the noun *"project"* in pertinent part as "(1): a specific plan or design . . . a scheme . . . (3): a planned undertaking: [as] (a): a definitely formulated piece of research . . . (b) (1): an undertaking devised to effect the reclamation or improvement of a particular area of land" (at p. 1813). The verb *"intend"* is defined in relevant part thus: "(2)(a)(1): to have in mind as a design or purpose: . . . (2) . . . as an object to be gained or achieved" (*id.* at p. 1175). The verb *"carry out"* is defined thus: "(1): to put into execution (2): to bring to a successful issue (3): to continue to an end or stopping point." (*Id.* at p. 344.)

Putting together these definitions, the statutory phrasing at issue takes on meaning: *any undertaking, designed to be put into execution and successfully completed.* Moreover, the pronoun "they" in the phrase "any project they intend to carry out" sharpens the significance of the words in the context of the case at bench. "They," of course, refers back to "legislative bodies of all cities and counties" in the first sentence of section 21151, and to "[a]ll other local governmental agencies" in the second sentence.[2]

In other words, under the first sentence of the section, legislative bodies of cities and counties which have an officially adopted conservation element of a general plan must make a *finding* that any undertaking *they* propose to put into execution which may have a significant effect on the environment "is in accord" with such conservation element. Under the second

---

[2]I recognize that Mono County did not have a conservation element at the time of the decisions of the planning commission and the board of supervisors, and thus only the second sentence of section 21151 is strictly applicable herein. Nevertheless, it is instructive to analyze both sentences to discern legislative intent, since both contain the crucial words "project they intend to carry out."

sentence, all *other* local governmental agencies (i.e., cities and counties which do *not* have an officially adopted conservation element)[3] must make an *environmental impact report* on any undertaking they propose to put into execution which may have a significant effect on the environment.

The meaning of this language is plain and clear. Local agencies (i.e., cities and counties) must make an environmental finding (to use a short-hand expression) or an environmental impact report, as the case may be, in connection with any proposed project which the local agency itself directly plans to put into effect or execute. To put it another way, such a finding or report is required only with respect to *public works* projects of local agencies (as described in Gov. Code, § 65401). Nowhere in section 21151 do we find any language to the effect that local agencies shall make such findings or reports with respect to *private* projects for which they may issue permits, licenses or other regulations. Certainly, if this had been the intention of the Legislature, it could have very easily expressed such intention in a few simple words, coordinated with the plain meaning of the words it had already employed.

This conclusion is buttressed by additional language in the second sentence of section 21151, to the effect that an impact report on "any project . . . which may have a significant effect on the environment" shall be submitted "as part of the report required by section 65402 of the Government Code." Section 65402 is found in chapter 3 ("Local Planning") of title 7 ("Planning") of the Government Code. It provides in brief that neither a county nor a city shall acquire real property for *public* purposes nor construct a *public* building or structure without making a report to the local planning agency so that the latter may ascertain whether the scheme conforms to its general plan. Since section 21151 environmental impact reports are to be incorporated in reports prepared pursuant to Government Code section 65402, it would make no sense for a section 21151 report to apply to a "project" beyond the scope of the Government Code section. Inasmuch as section 65402 applies only to *public* acquisition, development, or construction, so too must section 21151 apply only to public works projects, and *not* as well to *private* activity, carried out by a developer like International. A contrary result would lead to the admin-

---

[3]Clearly the phrase "[a]ll other local governmental agencies" in this context means cities and counties which have *not* officially adopted a conservation element in a general plan; it does not mean governmental entities *other* than cities and counties. (Compare section 50001 of the Government Code, which defines "local agencies" under the context of title 5 ("Local agencies"), division 1 ("Cities and Counties"), part 1 ("Powers and Duties Common to Cities and Counties"), chapter 1 ("General") as follows: " 'Local agency' as used in this division means county, city, or city and county, unless the context otherwise requires.")

istrative illogic of a local planning agency processing reports on activities beyond its statutory purview.

In sum, I conclude that the environmental finding or impact report requirement of section 21151 is not applicable to *private* activity for which a governmental permit is necessary, as opposed to "projects" *carried out* by *public* entities. I reach this result merely by analysis of the plain meaning of the statutory words "any project they intend to carry out" in the context of the section in which they are found. (See *People* v. *Knowles, supra,* 35 Cal.2d 175, 182-183; *In re Alpine, supra,* 203 Cal. 731, 737.)

The above analysis of the plain meaning of the words of section 21151 is supported by the Legislature's placement of that section in the statutory scheme of the EQA as a whole. Section 21151 is located in chapter 4 of the EQA, which the Legislature has entitled "Local agencies." Section 21151 is the only *operative* provision of the chapter—and of the entire act—setting forth the circumstances under which local agencies are *required* to adopt environmental findings or impact reports. Nowhere within chapter 4 is there mention of *private* activity or intent to regulate it. Similarly, chapter 3 of the act, labeled "State Agencies, Boards and Commissions," sets forth with almost identical wording requirements of environmental impact reports for projects that *state agencies, boards, and commissions* "propose to carry out which could have a significant effect on the environment of the state." (§ 21100.) Section 21100, the operative provision affecting state agencies, again does not indicate any intent to regulate private activity, nor can such indication be found anywhere else within chapter 3. Chapter 2 merely states the short title of the act.

Only in chapter 1, which the Legislature has merely labeled "Policy," is there any reference to "private interests," "individuals," or "corporations" (§ 21000, subds. (f) and (g)) or the general need to "regulate" their activities (§ 21000, subd. (g)). However, those lofty and imprecise references to private activity in chapter 1 pale in importance when compared with the fact of their omission in chapters 3 and 4. Since the latter chapters contain the only operative provisions of the act, their omission of any reference to private "projects" (e.g., for which a governmental permit is necessary) is significant.

Thus it is abundantly clear that the Legislature simply did not intend either section 21100 (environmental impact report on projects to be carried out by *state* agencies) or section 21151 (environmental impact report on projects to be carried out by *local* agencies) to apply to projects to be carried out by *private* persons or corporations. That clarity is apparent in the structure and framework of the EQA, the plain meaning of its opera-

tive language, and a textual examination of the section at issue. The majority make no attempt to interpret those words by accepted rules of literal construction. Instead they draw lavishly from general findings and declarations of the Legislature (concerning maintenance of environmental quality (§ 21000) and the policy of the state in that respect (§ 21001)), refer to similar language in federal law, and trace the course of the EQA through the Legislature. In short, the majority, unable to discover in the words of section 21151 any intent to cover *private* projects, attempt to persuade us by the elaborate reasoning referred to above, that in some way private projects must be deemed to be included anyhow. I suggest that in this venture they were completely unsuccessful. Plainly private projects are not so included.

The majority initially stress other sections of the EQA to support enlargement of the obviously limited meaning of section 21151. Chief reliance is placed on sections 21000 and 21001, which are said to "expressly set forth" the intent of the Legislature. In particular the opinion quotes section 21000, subdivision (g).[4] This subdivision, together with subdivisions (e) and (f) of section 21000 and subdivisions (d) and (f) of section 21001, is employed to support the broad proposition that "the Legislature intended to include the permit-issuing process [for private projects] as a governmental activity for which an environmental impact report is required." (*Ante,* at p. 257.)

Such an attempt to infuse these general expressions into section *21151* does not withstand scrutiny. Section 21151, setting forth requirements for environmental findings or impact reports, is the only section of the EQA with actual operative impact insofar as local agencies are concerned, as the parties herein recognize. It is found under a separate chapter 4, which has special reference to local agencies. It is the very last section of the act, separated by various intervening sections from the general "intent" provisions of sections 21000 and 21001. It constitutes a particular, special provision within the more general cast of the act as a whole.

However commendable the general declarations of state policy contained in sections 21000 and 21001, they exert no broadening influence on the clearly limited language of section 21151. They are impotent to make the clear words of that section say more than they actually do. Indeed, the broad declarations of sections 21000 and 21001 are properly harmonized with the particular operative provisions of sections 21100 (state projects) and 21151 (local governmental projects) by treating those particular

---

[4]"It is the intent of the Legislature that all agencies of the state government which *regulate* activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment. shall *regulate* such activities so that major consideration is given to preventing environmental damage." (Italics added.)

provisions as paramount to the general statements of the preliminary sections. (Code Civ. Proc., § 1859.)

My conclusion that section 21151 does not apply to private projects is supported rather than refuted by the legislative history of the act itself, as it passed from initial introduction in the Assembly to final enactment. While the "general intent" provisions of sections 21000 and 21001 were retained virtually intact in the course of the legislative process, the operative provision of section 21151 was significantly amended.

When Assembly Bill 2045 was first introduced on April 2, 1970, by members of the Assembly's Select Committee on Environmental Quality, the proposed section 21151 provided as follows: "All local governmental agencies shall conduct needed environmental impact studies and shall consider alternative methods *for any program carried out by them* which may have a significant effect on the quality of the environment." (Italics added.)

By May 26, 1970, the proposed section 21151 had been almost entirely rewritten, after referral to the Assembly Committee on Natural Resources and Conservation. The bill was reintroduced and passed by the Assembly on July 17, 1970. At that time proposed section 21151 read as follows: "The legislative body of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any *program they intend to carry out,* which may have a significant effect on the environment, is in accord with the conservation element of the general plan. Local governmental units without an officially adopted conservation element shall make environmental impact reports on any *program they intend to carry out,* which may have a significant effect on the quality of the environment. All other local governmental agencies shall make an environmental impact report on any *program they intend to carry out* which may have a significant effect on the environment and shall submit it to the appropriate local planning agency *as a part of the* report required by Section 65402 of the Government Code." (Italics added.)

The bill was then sent to the Senate, where the Senate Committee on Government Organization amended section 21151 again by striking the first above reference to "program" and replacing it with the words *"project or change in zoning,"* and by striking the second reference to "program" and replacing it merely with the word *"project."*[5]

---

[5]Thus the Senate's version of section 21151 on August 4, 1970, read as follows, deletions being shown by strike-outs and additions by italics: "The legislative body of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any ~~program~~ *project or change in zoning* they

On August 14, 1970, section 21151 was amended again.[6]

Finally, and most significantly, section 21151 was again amended, by deleting entirely the above second sentence referring to the environmental effect of any *"change in zoning."* Thus on August 20, 1971, the section read as it was finally adopted and reads now: "The legislative bodies of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any project they intend to carry out, which may have a significant effect on the environment, is in accord with the conservation element of the general plan. ~~The legislative bodies of all counties which have an officially adopted conservation element of a general plan shall make a finding that any change in zoning they intend to carry out, which may have a significant effect on the environment, is in accord with the conservation element of the general plan.~~ All other local governmental agencies shall make an environmental impact report on any project they intend to carry out which may have a significant effect on the environment and shall submit it to the appropriate local planning agency as part of the report required by Section 65402 of the Government Code."

Contrary to the majority's claim, no special significance may be attached to the intermediate amendments which may indeed fairly be summarized as a change from "program" to "project." That change is not nearly as clear or as broadening as the majority make it out to be, since either

intend to carry out, which may have a significant effect on the environment, is in accord with the conservation element of the general plan. Local governmental units without an officially adopted conservation element shall make environmental impact reports on any ~~program~~ *project* they intend to carry out which may have a significant effect on the quality of the environment. All other local governmental agencies shall make an environmental impact report on any program they intend to carry out which may have a significant effect on the environment and shall submit it to the appropriate local planning agency as part of the report required by Section 65402 of the Government Code."

[6] "The legislative ~~body~~ *bodies* of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any project ~~or change in zoning~~ they intend to carry out, which may have a significant effect on the environment, is in accord with the conservation element of the general plan. ~~Local governmental units without an officially adopted conservation element shall make environmental impact reports on any project they intend to carry out which may have a significant effect on the quality of the environment.~~ *The legislative bodies of all counties which have an officially adopted conservation element of a general plan shall make a finding that any change in zoning they intend to carry out, which may have a significant effect on the environment, is in accord with the conservation element of the general plan.* All other local governmental agencies shall make an environmental impact report on any ~~program~~ *project* they intend to carry out which may have a significant effect on the environment and shall submit it to the appropriate local planning agency as part of the report required by Section 65402 of the Government Code."

"program" or "project" may connote "planning" or, on the other hand, actual physical alterations in the environment. Nor is the analogy to the federal guidelines under the National Environmental Policy Act (NEPA) helpful in this instance, since, as will be explained, the *differences* between the federal and state enactments are more significant than the similarities in solving the present problem.

The truly important amendment, in my view, is the last one, which deletes the requirement that any legislative body of a city or county with a conservation element in its general plan make a finding of environmental accordance with that element for any "*change in zoning*" which it "intends to carry out." In other words, after the amendment, and as enacted, section 21151 requires the local body to find accordance with the conservation element of its general plan only for a "*project*" which it intends to carry out. In a strict sense it is arguable that the change is inapplicable to Mono County, since it did not have such conservation element at the pertinent time; but the change is nevertheless meaningful to show the narrowing process to which section 21151 was subjected in the course of final enactment. The Legislature's obvious decision to make the requirements of section 21151 *inapplicable* to local zoning changes is especially important in the instant case, since zoning amendments and changes are one of the classic means by which a locality regulates *private* activity. The narrowing of section 21151 in this manner strengthens the conclusion that the Legislature did not intend the operative provisions of that section to apply to *private* activity for which a governmental permit is necessary, but intended them to apply only to public works projects.

I turn now to consider the majority's reliance upon the federal act (NEPA) and the interim guidelines of the Council on Environmental Quality (*ante,* pp. 260-262). Respondents concede in their brief that the NEPA and the council's interim guidelines are part of the legislative history of the state act, by virtue of their adoption shortly prior to the passage of the state act and because of similarities in provisions (see *ante,* p. 260). Yet, as respondents point out, the very similarities between the state act and the federal language underscore the fact that the Legislature intended the *differences* to be meaningful—a well-established rule (*City of Port Hueneme* v. *City of Oxnard* (1959) 52 Cal.2d 385, 395-396 [341 P.2d 318]; *Estate of Simpson* (1954) 43 Cal.2d 594, 600 [275 P.2d 467]; *People* v. *Kuhn* (1963) 216 Cal.App.2d 695, 699 [31 Cal.Rptr. 253]) which the majority ignore. Examination of these differences results again in the conclusion that section 21151 does not apply to a private project for which a governmental permit is required.

First, the NEPA provides in section 102(2)(C) (42 U.S.C. § 4332(2)(C))

that: "The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall . . . . [¶] (C) include in every recommendation or report on proposals for legislation and other *major Federal actions* significantly affecting the quality of the human environment, a detailed [environmental impact] statement by the responsible official . . . ." (Italics added.)

Next, the interim guidelines of the Council on Environmental Quality, promulgated on May 11, 1970 (before any significant amendments to the EQA) stated:

"5. *Actions included* [under the NEPA] . . . .

"(a) 'Actions' include but are not limited to:

"(i) Recommendations or reports relating to legislation and appropriations;

"(ii) Projects and continuing activities;

"— *Directly undertaken by Federal agencies;*

"— Supported in whole or in part through Federal contracts, grants, subsidies, loans or other forms of funding assistance;

"— *Involving a Federal lease, permit, license, certificate or other entitlement for use;*

"(iii) Policy—and procedure-making." (35 Fed.Reg. 7390, 7391; see also 36 Fed.Reg. 7724, 7724; italics added.)

In light of this tri-partite federal categorization of "projects," which, as the majority remind us, the Legislature had in mind when it enacted the EQA, what are we to make of the now-familiar phrasing of section 21151, "any project they intend to carry out," i.e., any project which local agencies intend to carry out?

To me two crucial points are clear. First, the very use of the word "project" by the Legislature in the first place shows that the Legislature intended section 21151 to have narrower scope than the federal provisions, since "project" is manifestly a *subcategory* of "actions" according to the federal guideline No. 5. This difference in wording indicates that the Legislature desired to limit the coverage of section 21151 to "projects" only (subcategory (ii)) as opposed to "[r]ecommendations or reports relating to legislation and appropriations" or "[p]olicy—and procedure-making."

Second, when we scrutinize the *type* of "project" covered by section

21151 — any project local bodies or agencies intend to carry out — the analogy between the federal and state language is evidently *not* the one urged by the majority. Examination of the three federal types of "[p]rojects and continuing activities,"[7] *supra,* compels the conclusion that the Legislature was analogizing to "[p]rojects and continuing activities; [¶] *[d]irectly undertaken by federal agencies*" when it adopted section 21151. The phrase "any project [local agencies] intend to carry out" in the EQA is clearly similar to the phrase "[d]irectly undertaken by federal agencies" in the federal guidelines. These two types of "projects" can be readily analogized and their similarity is pronounced, when we consider the marked *difference* between the phrasing of section 21151 and the other two types of federal projects: those "[s]upported in whole or in part through Federal contracts, grants . . . or other forms of funding assistance," or those "[i]nvolving a Federal lease, permit, license, certificate or other entitlement for use."

In light of these differences, which we must deem significant, the phrase "any project they intend to carry out" *again* takes on the meaning of a project *actually executed or carried forward by local agencies* (a public works project)—just like projects *directly undertaken by Federal agencies.* Moreover, under the rule of *"expressio unius est exclusio alterius"* the Legislature was evidently *not* including within the coverage of section 21151 private projects for which a governmental permit is required. If the Legislature had intended such a result, it would indeed have *included* language similar to that used in the description of the counterpart type of Federal project: "[i]nvolving a Federal lease, permit, license, certificate or other entitlement for use." There is simply no basis for the majority's facile conclusion to the contrary.

Nor is there any justification, let alone constructional value, to the majority's "parenthetical" use of the statement of Assemblyman Knox in an attempt to shore up its interpretation of the Legislature's intent. It is a settled principle that such statements are *inadmissible* to show the intent of the Legislature as a whole in construction of statutes. (*In re Lavine* (1935) 2 Cal.2d 324, 327 [41 P.2d 161, 42 P.2d 311]; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 603 [45 Cal.Rptr. 512].) I see no reason to depart from this rule of law in the instant case, even

---

[7]The EQA omits the federal reference to "continuing activities" as well as "projects." This is one difference which is *not* significant in the instant context, since the distinction between "projects" and "continuing activities" would appear to be one of time duration, having nothing to do with the distinction between public and private activity at issue herein. Of course, the omission of "continuing activities" in the EQA may indeed be important in other cases.

"parenthetically"; there has been no adequate showing that the statement of Assemblyman Knox (or, for that matter, the contrary declaration of Assemblyman Porter) falls within the sole exception to the rule, where the legislator's testimony consists only of a reiteration of legislative discussion leading to adoption of proposed amendments, which "amounts to a report of the [legislative] committee's activity . . . and is certainly part of the legislative history . . . ." (*Rich* v. *State Board of Optometry, supra,* 235 Cal.App.2d 591, 603.)

The majority also ignore the fact that two new bills were introduced in the Assembly in March 1972 precisely for the purpose of *expanding* the scope of section 21151 from "any project they intend to carry out" to "any major action," as that term is almost identically explicated in the federal guidelines referred to above. The introduction of these new bills indicates that many legislators do not believe that the present section 21151 carries the broad impact assigned to it by the majority.

On March 2, 1972, 46 members of the Assembly, together with 14 members of the Senate as co-authors, introduced A.B. 681. This bill would, inter alia, add a fifth chapter to the EQA concerning environmental review of actions by public agencies. The new chapter would institute a Department of Environmental Impact Review as an administrative subdivision of the State Environmental Quality Board. Section 99 of the bill would amend the present section 21151 to read as follows (deletions shown by strike-outs, additions by italics): "The legislative bodies of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any ~~project they intend to carry out~~, *major action* which ~~may~~ *could* have a significant effect on the environment, is in accord with the conservation element of the general plan. All other local governmental agencies *including districts* shall make an environmental impact report on any ~~project they intend to carry out~~ *major action* which ~~may~~ *could* have a significant effect on the environment and shall submit it to the appropriate local planning agency as part of the report required by Section 65402 of the Government Code *and to the State Environmental Quality Board. . . .*"

Section 98 of the bill would institute a new section 21102 which would define the term "action" as follows:

"(a) Recommendation or reports relating to legislation and appropriation.

"(b) *Projects and continuing activities:*

"(1) *Directly undertaken by public agencies.* [¶] (2) *Supported in whole*

*or in part through public contracts, grants, subsidies, loans or other forms
of funding assistance. [¶] (3) Involving a public lease, permit, license, cer-
tificate or other entitlement for use.*

"(c) Policy and procedure making." (Italics added.)

This terminology is, of course, identical to the federal guideline No. 5
quoted *supra,* except for the immaterial substitution of the word "public"
for the word "federal" to render the language relevant to the state setting.
First, the proposed amendment would plainly widen the scope of section
21151 to cover not only "projects and continuing activities" but other
subcategories of "actions" as well; second, the proposed amendment would
also broaden the meaning of the word "project" itself, from the type now
covered (projects which public agencies "intend to carry out," i.e., "[d]irectly
undertaken by public agencies") to include as well those projects "[i]nvolv-
ing a public lease, permit . . . or other entitlement for use." The pro-
posed amendment, in light of the directly analogous federal wording,
cannot be explained merely as an attempt to clarify but not broaden the
present meaning of "project" as that word appears in section 21151. The
suggested change shows that 60 members of the Legislature do not believe
that the present section 21151 covers purely private activity for which a
public permit is necessary. That so many legislators co-authored the pro-
posed amendment contained in A.B. 681 is further evidence of the in-
accuracy of the majority's interpretation of the present section 21151.

Moreover, on March 13, 1972, A.B. 889 was introduced (by Assembly-
man Knox himself). This bill proposes many of the same amendments to
the EQA included in A.B. 681 (e.g., by adding a new chapter 2.5 defining
certain terms such as "project" (substantially identical to the above wording
of A.B. 681) and "public agency" (any "state agency, board, or commis-
sion, any county, city and county, city, regional agency, public district,
or other political subdivision")). In addition, A.B. 889 would amend
section 21151 to read as follows (deletions shown by strike-outs, additions
by italics): "The legislative bodies of all cities and counties which have
an officially adopted conservation element of a general plan shall make a
finding that any project they intend to carry out, which may have a sig-
nificant effect on the environment, is in accord with the conservation
element of the general plan. All ~~other~~ local ~~governmental~~ agencies shall
make an environmental impact report on any project they intend to carry
out which may have a significant effect on the environment ~~and shall
submit it to the appropriate local planning agency as part of the report
required by Section 65402 of the Government Code.~~ *When a report is
required by Section 65402 of the Government Code, the environmental
impact report may be submitted as a part of that report.*"

Once again, the thrust of these proposed changes is evident: Section 21151 would expressly cover the type of "project" which plaintiffs herein wish were covered now. Environmental impact reports would be submitted for projects *other* than the public works type of projects for which a report is required under Government Code section 65402. A.B. 889 and A.B. 681 together constitute additional support for respondents' basic contention: that the present section 21151 does not apply to private activity involving a use permit, such as International's proposed development at Mammoth Lakes.

To recapitulate, the majority opinion in my view ignores the plain meaning and usual import of the particular words of section 21151 which are applicable to Mono County's decision to grant the conditional use permit to International. The opinion cites legislative history and analogous federal language which in fact negate rather than support an expansive interpretation of section 21151. The opinion relies on general declarations of legislative policy at the beginning of the EQA which simply are not effectuated in section 21151 in the manner urged. I, as well as the majority, am conscious of the profound need to improve and maintain the quality of California's environment (see, e.g., *People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 485-488, 491-494 [96 Cal.Rptr. 553, 487 P.2d 1193]), but settled principles of statutory construction cannot be set aside by the judiciary in order to achieve that high purpose.

I conclude that the action taken by the Mono County Planning Commission and the Mono County Board of Supervisors was in all respects regular and lawful. The pertinent ordinance did not require said bodies to make specific findings of fact in respect to the issuance of the use permit. (Cf. *Schumm* v. *Board of Supervisors* (1956) 140 Cal.App.2d 874, 878, 880-881 [295 P.2d 934].) The record discloses that the issuance of the permit was supported by substantial evidence and did not constitute an abuse of discretion.

I would affirm the order.

The petition of the defendants and respondents for a rehearing was denied November 6, 1972. Sullivan, J., was of the opinion that the petition should be granted.