[No. E014248. Fourth Dist., Div. Two. Aug. 13, 1996.]

SCHAEFER DIXON ASSOCIATES, Plaintiff and Appellant, v. SANTA ANA WATERSHED PROJECT AUTHORITY, Defendant and Respondent.

526

COUNSEL

Farmer & Ridley, John G. Powers and Kevin L. Smith for Plaintiff and Appellant.

Aklufi & Wysocki, Joseph S. Aklufi and David L. Wysocki for Defendant and Respondent.

Lagerlof, Senecal, Bradley & Swift and Timothy J. Gosney as Amici Curiae on behalf of Defendant and Respondent.

OPINION

RICHLI, J.—Plaintiff and appellant Schaefer Dixon Associates (contractor) filed the action below against defendant and respondent Santa Ana Watershed Project Authority (referred to hereafter as the agency) over a contract dispute concerning payment for soil testing services the contractor had performed on a wastewater pipeline project for the agency. The trial court granted summary judgment in favor of the agency on the ground that the contractor had failed to make a claim with the agency under the Government Tort Claims Act (Gov. Code, § 900 et seq.) before filing suit. The contractor appeals, urging that a letter it had written to the agency's general manager about the dispute was a "claim" within the meaning of the Tort Claims Act. We affirm.

## FACTS

In April of 1990, the contractor submitted a proposal to provide geotechnical services (e.g., field density tests of trench backfilling) in connection with the construction of a wastewater pipeline project of the agency. Based on the plans and specifications for the project, the contractor estimated its services would cost $75,000 for the project. The contractor's proposal indicated that fees could either increase or decrease depending upon construction progress, among other things.

The contractor began its work on the project in July of 1990. Construction was much slower than anticipated, however, and the contractor wrote a letter to the agency's project manager on September 7, 1990, requesting approval for $45,000 in additional fees.

Even though the contractor called the agency several times over the matter, the agency did not respond promptly to the contractor's request. Consequently, on December 3, 1990, the contractor sent another letter, threatening to suspend operations unless its additional fees were authorized. The agency asked the contractor not to suspend its services, and gave assurances that the problem could be resolved. The next day, December 4, 1990, the agency approved a change order for $25,000 in additional fees.

On January 21, 1991, the contractor sent another letter to the agency. Because the contractor expected to be continuing to perform work through March or April of 1991, it requested an additional $150,000 in fees to complete its field testing work. The agency agreed that progress had been slower than anticipated, and, by a second change order, increased the total authorized fees to $225,000 ($25,000 less than that requested).

In the next period of time, the work again went more slowly than predicted. Then the pipeline builder began multiple pipeline headings and accelerated the construction progress, requiring the contractor to put more of its people on the job. Nevertheless, in March and April it became obvious the work would go into the late spring. The contractor realized that its fees would be affected, and wrote a letter to the project manager on April 30, 1991. The contractor estimated that $65,000 in additional fees would be needed, bringing the total to $290,000.

The contractor asked several times for a meeting, but the agency did not arrange a meeting until June 11. As of that time, the contractor informed the agency that it would exhaust the authorized $225,000 as a result of expanded and accelerated construction activity. It estimated its current project charges

at close to $300,000 and, with work still remaining to be done, the fees could go as high as $350,000.

By a letter dated July 3, 1991, the contractor recapitulated the discussion from the June meeting and informed the agency that its fees were over $351,000 through June 30, 1991. With another $9,000 in anticipated additional charges for the work remaining, the contractor estimated its total charges to complete the project would be $360,000. It offered a $30,000 discount, however, in anticipation of working with the agency on other projects, and asked for authorization for a total of $330,000.

The agency's project manager initially rejected the request altogether. When the contractor pointed out that it had already been paid some sums in excess of the authorized $225,000, the project manager sent a letter offering to authorize $275,000 in total fees.

The agency granted a meeting in July, at which its representative promised to look into the fee dispute and attempt to reach a resolution. On September 3, 1991, the contractor's representatives met with the project manager to discuss the fee issue again. The project manager agreed to recommend to the agency that it pay the contractor's invoices, if the contractor maintained the $30,000 discount. In early September, the contractor submitted final invoices for approximately $370,000. On September 30, 1991, the project manager told the contractor he had discussed the fees with the agency's management officials, and asked the contractor what its final offer would be. The contractor reiterated its offer to discount the fees $30,000. On October 7, 1991, the project manager asked the contractor to "split the difference" between the $275,000 agency offer and the $370,000 invoice price. The contractor insisted it could not discount its fees any further than the $30,000 already offered.

There was apparently another meeting with agency officials on November 4, 1991. It was evidently as a result of that meeting that the contractor sent a letter dated November 15, 1991, to the agency's general manager. The letter outlined the history of the contractor's work on the project and the dispute over fees, and asked the general manager for his personal involvement in the resolution of the fee dispute. The contractor demanded its full invoiced fees and rescinded its offer of a $30,000 discount. The contractor "encourage[d the general manager's] direct involvement on the issue" and agreed to provide any additional information on request.

The agency general manager replied on December 9, 1991, that a review and investigation of the problem was underway. The contractor did not hear

anything further for several weeks. Accordingly, it sent another letter to the general manager on January 28, 1992. The letter expressed concern at not having heard anything for six weeks. The contractor requested a meeting with the general manager to resolve the fee matter.

On February 21, 1992, the agency's general manager sent a letter to the contractor, expressing dissatisfaction with the amount of the cost overrun. The agency approved payment for a total of $275,000 for the contractor's services.

The contractor's attorneys sent a letter to the agency's general manager on March 9, 1992. This letter pointed out that the February 21, 1992, offer to pay $275,000 was "not responsive" to the contractor's November 15 letter. Counsel warned that the contractor was unwilling to bear the adverse financial consequences for the agency of the project's unanticipated overruns. The March 9 letter recited that $113,358.47 was still outstanding and unpaid, and that the contractor was "prepared to pursue its remedies against" the agency. Counsel demanded a response by March 20, 1992.

On March 26, 1992, apparently after some further discussion with the agency's representatives, the contractor's attorneys again asked the agency to state its position. If the general manager chose not to take the issue to the agency's board, counsel planned to "initiate appropriate action for the collection of the outstanding amount." Counsel further advised he was authorized to accept $92,500 "in settlement of [the contractor's] claim." The letter warned that, if counsel did not receive a response by March 31, 1992, the contractor would "assume that . . . our proposal has been rejected, and we will proceed forward."

The agency replied on March 30, 1992, stating that the contractor had estimated in April 1991 that the total cost for completion would be $290,000, when the project construction was 91 percent complete. "In spite of this advanced stage of construction completion, as you know the final total of $360,000 substantially exceeded the $290,000 figure." The agency blamed the contractor for poor cost management, and reiterated its offer to pay up to a total of $275,000 in fees. A second letter from the agency's general manager, dated March 31, 1992, offered to pay up to $290,000.

By a letter of June 25, 1992, the contractor's attorney advised the agency's general manager that there may have been misunderstandings about the directions the agency gave to the contractor during the project. Counsel requested a meeting with the general manager "prior to pursuing a judicial resolution," in order to bring certain facts to the agency's attention that might bear on its decision.

There was apparently additional contact in September of 1992; the contractor's attorneys evidently wrote a letter dated September 1, 1992, summarizing its position on the fee matter. The agency's general manager replied on October 2, 1992, advising that he would recommend approval of $290,000 in total payments for the contractor's services.

The fee dispute apparently remained unresolved, however, and the contractor filed an action on May 3, 1993, for breach of contract, for an account stated, and for quantum meruit. The complaint alleged that the contractor's letter of November 15, 1991, was a "claim" against the agency, as a governmental entity, for purposes of the Tort Claims Act, and that the claim had been denied.

The agency moved for summary judgment on the ground that the contractor had failed to comply with the Tort Claims Act, and that the November 15 letter did not constitute a "claim" for purposes of the Act. The contractor maintained that its November 15 letter satisfied the statutory requisites of a claim.

At hearing on the summary judgment motion, the court granted a continuance for further briefing on the issue of the sufficiency of the letter as a claim, in light of *Phillips* v. *Desert Hospital Dist.* (1989) 49 Cal.3d 699 [263 Cal.Rptr. 119, 780 P.2d 349]. The court asked the contractor to supply any cases in which a letter that did not threaten litigation had been considered a sufficient claim. The contractor was unable to supply any such case, but attempted to distinguish *Phillips*, and pointed out that, if a threat of litigation were required, its later letters to the agency, dated March 9 and March 26, 1992, *had* threatened litigation.

The trial court granted the motion for summary judgment. The contractor moved for reconsideration. The court's ruling had apparently been based on the notion that the November 15 letter could not be a claim because it did not threaten litigation. The contractor sought to amend its complaint to set forth the March 9 and March 26 letters as part of the claim, as those letters did threaten suit. The trial court denied the motion for reconsideration. The contractor appeals from the judgment entered in favor of the agency.[1]

---

[1] The contractor's notice of appeal stated it appealed also from the award of attorney fees in favor of the agency. The agency asserts that, because no argument was directed expressly to the issue of attorney fees, the contractor has abandoned that issue. The assertion is specious, as the contractor's appeal attacks the ruling on the summary judgment motion, which was of course the predicate for any award of attorney fees. The award of fees below thus stands or falls with the judgment as a whole.

## DISCUSSION

### I. *Standard of Review*

■ We review the judgment, based on the order granting summary judgment, independently, to determine whether summary judgment was properly granted; i.e., whether there are any triable issues of fact. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511, 1515 [285 Cal.Rptr. 385].) We undertake the same process as that used by the trial court. First, we determine the issues framed by the pleadings. Second, we determine whether the agency, as the defendant moving party, has negated at least one element of each of the contractor's causes of action. Third, assuming the agency has made out a prima facie case for judgment in its favor, we determine whether the contractor has shown there are triable issues of fact so as to preclude summary judgment. (*Schrader* v. *Scott* (1992) 8 Cal.App.4th 1679, 1683-1684 [11 Cal.Rptr.2d 433].)

The salient facts here are essentially undisputed; "the only dispute is over the legal effect and significance of the undisputed facts, which is a pure matter of law." (*Schrader* v. *Scott, supra,* 8 Cal.App.4th at p. 1684.)

### II. *Tort Claims Act Procedures and Requirements*

Under the Tort Claims Act, claims against local governmental entities must be presented to the relevant entity within six months (personal injury or property damage) or one year (other causes of action) of the date of accrual of the cause of action. (Gov. Code, § 911.2.) "The public entity has 45 days to grant or deny the claim; if the claim is not acted upon within 45 days, it is deemed rejected. (§ 912.4.) If written notice of rejection is sent, suit must be brought within six months. (§ 945.6, subd. (a)(1).) If no written notice is given, the claimant is allowed two years from the accrual date to file the suit. (§ 945.6, subd. (a)(2).)" (*Chalmers* v. *County of Los Angeles* (1985) 175 Cal.App.3d 461, 464 [221 Cal.Rptr. 19].)

Government Code section 910 prescribes the requirements for making a claim. A claim must contain all the following information:

"(a) The name and post office address of the claimant.

"(b) The post office address to which the person presenting the claim desires notices to be sent.

"(c) The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted.

"(d) A general description of the indebtedness, obligation, injury, damage or loss incurred *so far as it may be known at the time of presentation of the claim.*

"(e) The name or names of the public employee or employees causing the injury, damage, or loss, if known.

"(f) The amount claimed if it totals less than ten thousand dollars ($10,000) as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed. If the amount claimed exceeds ten thousand dollars ($10,000), no dollar amount shall be included in the claim. However, it shall indicate whether jurisdiction over the claim would rest in municipal or superior court."

A governmental entity may provide forms for making claims, but the claimant is not required to use such a form as long as its claim conforms to the requirements of Government Code section 910 and is signed. (Gov. Code, § 910.4.) Substantial compliance is all that is required. (*Ibid.*)

If a claim does not substantially comply with Government Code section 910, the governmental board must give notice of the deficiency within 20 days. (Gov. Code, § 910.8.) If the board fails to give notice of the insufficiencies or omissions in a defective claim, the entity waives any defenses as to the sufficiency of the claim. (Gov. Code, § 911.)

### III. *Sufficiency of the Letter as a "Claim"*

#### A. *Contentions*

 The contractor argues on appeal, as below, that its letter of November 15, 1991, satisfies all the statutory requisites for a claim.[2] Even if the letter did not comply precisely with the statutory requirements, the contractor urges that the letter substantially complied with the requirements of

---

[2]The contractor argues that its letter identified the name and postal address of the claimant (Gov. Code, § 910, subd. (a)), that it stated in its conclusion that notice should be sent to the signers at the post office address given on the letterhead (Gov. Code, § 910, subd. (b)), that the letter provided a detailed description of the project and the manner in which the obligations (invoices) were incurred (Gov. Code, § 910, subd. (c)), that it gave a detailed description of the obligation (Gov. Code, § 910, subd. (d)), that it mentioned the names of all the public employees who negotiated with the contractor (Gov. Code, § 910, subd. (e)), and that the letter also made "clear that the amount claimed is $95,000 ($370,000 billed minus $275,000 paid)" (See Gov. Code, § 910, subd. (f)).

Government Code section 910. In addition, even if the letter be deemed deficient as a claim, the contractor argues the agency waived the right to contest its sufficiency, because the agency failed to notify the contractor of claim deficiencies under Government Code section 910.8. Finally, the contractor attempts to distinguish cases, upon which the agency relied, concerning whether a series of letters may constitute a claim (*Dilts* v. *Cantua Elementary School Dist.* (1987) 189 Cal.App.3d 27 [234 Cal.Rptr. 612]) and whether a letter may serve as a claim if it does not indicate that litigation will ensue if the demand is not met (*Phillips* v. *Desert Hospital Dist.*, *supra*, 49 Cal.3d 699). We reject all the contentions for the simple reason that the November 15 letter was never intended and never treated as the functional equivalent of a formal claim.

### B. *Analysis*

We conclude that the November 15 letter was not a "claim" within the meaning of the Tort Claims Act. Although only substantial compliance, rather than strict compliance, is required (see *City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 456-457 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223]), the purported "claim" must be readily identifiable as such.

In *Phillips* v. *Desert Hospital Dist.*, *supra*, 49 Cal.3d 699, the plaintiff sent the hospital district a notice, pursuant to Code of Civil Procedure section 364, of intention to commence a malpractice action against a medical provider. The California Supreme Court held that the document was not a claim under the Tort Claims Act, but was a "claim as presented," triggering the need to notify the claimant of defects, because it "discloses the existence of a 'claim' which, if not satisfactorily resolved, will result in a lawsuit against the entity. [Citation.]" (49 Cal.3d at p. 709.)

In *Foster* v. *McFadden* (1973) 30 Cal.App.3d 943 [106 Cal.Rptr. 685], a case upon which the *Phillips* court substantially relied, the plaintiff's attorney sent a letter to a sanitation district employee, with a copy to the sanitation district, advising of the date and location of an accident and requesting insurance carrier information. The letter further requested notification of what disposition of the matter was intended, in order to " 'eliminate the necessity for initiating formal proceedings . . . .' " in the matter. The district, rather than the individual employee, responded by supplying its insurance carrier information. The court held that the letter, although it did not substantially comply with the requirements of the claims act, was the functional equivalent of a claim, and, indeed, the district had recognized the letter as such. (*Id.* at pp. 945-946, fn. 2.)

From *Phillips* and *Foster,* the Court of Appeal in *Green v. State Center Community College Dist.* (1995) 34 Cal.App.4th 1348 [41 Cal.Rptr.2d 140] synthesized a legal standard applicable to correspondence alleged to be a claim: "We hold that to be sufficient to constitute a trigger-claim under [Government Code] section 910.8, the content of the correspondence to the recipient entity must at least be of such nature as to make it readily discernible by the entity that the intended purpose thereof is to convey the assertion of a compensable claim against the entity which, if not otherwise satisfied, will result in litigation." (*Id.* at p. 1358.)

Although the intended purpose of the November 15 letter here was to advise of a monetary dispute, the plain import of the letter was merely to provide information and to request negotiation of an ongoing dispute, and not to advise of imminent litigation over a "claim." The tenor of the letter was like the previous letters asking for "change orders" in the contract. The contractor merely asked the general manager of the agency for his personal attention to and intervention in the course of the ongoing dispute.

Moreover, the contractor's later letter, of January 28, 1992, did not treat the November 15, 1991, letter as equivalent of a "claim" to which the agency had to respond within 45 days; rather, the January 28 letter simply reiterated a request for a meeting on the subject. In this context, it was not "readily discernible by the agency"—or by anyone, including the contractor—that the November 15 letter was to be treated as a claim or as a warning of impending litigation over a potential claim.

Our conclusion is borne out by other circumstances as well. For example, Government Code section 915 requires a claim to be presented to the public entity by "(1) Delivering it to the clerk, secretary or auditor thereof; or [¶] (2) Mailing it to such clerk, secretary or auditor or to the governing body at its principal office." (Gov. Code, § 915; see also *Tapia* v. *County of San Bernardino* (1994) 29 Cal.App.4th 375, 385 [34 Cal.Rptr.2d 431].) The November 15 letter was not "presented" as required to the proper person, but rather was directed to the personal attention of the general manager for purposes of "enlisting your help in resolving" the payment issue.

In addition, the contractor's attorney's correspondence of March 9 and March 26, 1992, did not constitute a claim or claims. Although these letters did advise the agency of a demand for monetary damages and did threaten litigation if not resolved, each letter demanded a response within fewer than 45 days. Thus, the contractor's attorneys never treated the correspondence as claims requiring a 45-day response under the Tort Claims Act, and did not purport to adhere to the procedures of the act.

Policy also supports our conclusion the November 15 letter (nor any other) should not be treated as a claim, defective or otherwise. *Dilts* v. *Cantua Elementary School Dist.*, *supra*, 189 Cal.App.3d 27, concerned a school district superintendent whose employment was terminated. The employee's attorney wrote several letters to the district. The first letter advised that the employee considered the discharge a breach of contract and offered to accept a monetary settlement. Another letter offered to settle for a lesser sum. The employee submitted a letter of resignation conditioned on acceptance of the settlement. The district offered a settlement, and the attorney wrote another letter, agreeing to the terms of the settlement on condition the settlement moneys were considered additional salary, and recited that, if the district did not agree, the attorney would file suit. The district did not respond and the employee filed an action, alleging that the series of letters constituted a "claim" under the Tort Claims Act.

The *Dilts* court rejected the notion that a series of letters could constitute a "claim." ". . . [T]he often-cited purpose of the claims act is to enable the public entity to make an adequate investigation of the merits of the claim and to settle the claim without the expense of litigation. [Citation.] However, there are other practical considerations in determining whether or not the purposes of the act are being served. The established procedure for the filing of claims pursuant to the Tort Claims Act would become totally unworkable if this court were to hold that a series of writings could collectively be considered a claim.

"If a series of letters received over a period of time could collectively constitute a claim, it would be impossible to ascertain whether a claim had been presented within the . . . time limitation as specified in section 911.2. The act provides that if a claimant files a timely claim, the public entity has 45 days within which to grant or deny the claim. (§ 911.6.) If the claim is denied by way of a written notice, the claimant has six months within which to file a court action. (§ 913.) If the claim is not acted upon . . . within 45 days, it is deemed denied by operation of law and the claimant has 2 years within which to file a court action. (§ 945.6.) It would be difficult for the public entity to identify whether a particular letter were a claim and which letter triggered its obligation to accept or deny a claim if a series of correspondence could be considered collectively to constitute a claim. If an agency was unable to determine whether a claim had been filed or when the claim had been filed, it would be equally difficult for the court to determine which statute of limitation applied or when the statute of limitations began to run.

"The procedures prescribed by the Tort Claims Act envisioned the filing of a single claim with the public entity so that the public entity may

investigate the claim, consider settlement and formally approve or reject a claim. The letters sent to the district on behalf of [the employee] by his attorney do not constitute a claim within the meaning of the Tort Claims Act, and the doctrine of substantial compliance cannot be applied." (*Dilts* v. *Cantua Elementary School Dist., supra,* 189 Cal.App.3d 27, 35-36.)

The practical considerations discussed in *Dilts* are also operative here. Even though the contractor argues a single letter, rather than a series of letters, constituted the "claim," the November 15 letter was in fact one among many letters of correspondence about "change orders" and requests for payment authorization.[3] It is entirely unworkable to expect the public entity to discern that this letter, unlike the others, was to be treated as a "claim," particularly in view of the fact that the contractor itself never treated any of its letters as if they were a claim. Why should not the March 9 or March 26 letters, which, unlike the November 15 letter, did threaten suit, better be considered "claims"? How is the agency to know whether a claim is timely presented whenever a supplier or contractor asks for or complains about a change order? How is the court to determine which statute of limitations applies and whether it has run? For the same reasons outlined in *Dilts*, the "substantial compliance" doctrine is simply inapplicable here.

Because, as in *Dilts*, effectively no claim was in fact filed, "plaintiff cannot assert a duty on the part of the [agency] to notify it of 'insufficiency of claim' under sections 910.8 and 911, Government Code, [fn. omitted] or of its failure to file a claim or advise it to do so." (*Stromberg, Inc.* v. *L.A. County Flood etc. Dist.* (1969) 270 Cal.App.2d 759, 764 [76 Cal.Rptr. 183].) The contractor's contention that the agency waived its right to object to any defects in the November 15 letter as a claim, because it failed to notify the contractor of the defects, is thus revealed to be absurd. If a governmental entity cannot be expected to recognize a particular letter in the midst of a series of letters as a "claim," there is no reason to believe it should have advised the sender of the letter's defects to operate as a "claim."

The contractor argues that the court below erred in denying its motion to amend the complaint to allege the March 9 and March 26, 1992, letters as

---

[3]The contractor relies on *Wilson* v. *Tri-City Hospital Dist.* (1990) 221 Cal.App.3d 441 [270 Cal.Rptr. 436], for the proposition that a series of letters can indeed constitute a sufficient claim under *Phillips*. The contractor's reliance is misplaced. In *Wilson*, the claimant hired a first attorney to represent him in a wrongful termination claim. That attorney sent a letter requesting relief (reinstatement, reemployment, severance pay, etc.), and stated "I will be forced to take further action" (*id.*, at p. 444) if amicable settlement were not reached. At some point, the fired employee hired a second lawyer, who also wrote letters expressly mentioning litigation and asking for "substantial money" on the employee's behalf. *Each* of the letters fully advised the public entity, as required in *Phillips*, of "the existence of a claim that if not paid or otherwise resolved will result in litigation." (*Phillips* v. *Desert Hospital Dist., supra,* 49 Cal.3d 699, 707-708.)

the "claim." The argument is unavailing. Although these two letters do contain threats to sue over the money dispute, the letters were never intended and never treated by anyone as a purported Tort Claims Act "claim." As previously noted, had the contractor genuinely considered the letters as "claims" for purposes of the Tort Claims Act, it would have had to allow the agency 20 days to point out deficiencies and 45 days to accept or reject the claim(s). Instead, the letters demanded immediate responses (by March 20 in the March 9 letter, and by March 31 in the March 26 letter).

The contractor argues, in reliance on *Phillips*, that the subjective intent of the letter writer was irrelevant to a letter's status as a "claim as presented." Although *Phillips* does so state, it does so in different circumstances. The notice received by the hospital district in *Phillips* was itself a notice of impending litigation. Here, the functions to be served by making a claim— including making the public entity aware of a matter requiring its action under the Tort Claims Act—were not served. The November 15 letter was not "readily discernible" as a "claim" at all, requiring action by the agency under the Tort Claims Act. The correspondence of March 9 and March 26, 1992, demanded responses in derogation of the statutory claims procedures. If the contractor itself never recognized any of its letters as a "claim," it cannot expect the agency to have done so.

Because the contractor filed no cognizable "claim" under the Tort Claims Act, the agency established a complete defense (or lack of an essential element) to the contractor's causes of action. The summary judgment motion was properly granted.

### DISPOSITION

The judgment is affirmed. Defendant shall recover costs on appeal.

Ramirez, P. J., and McKinster, J., concurred.