Opinion
 

 BAMATTRE-MANOUKIAN, J.
 

 The owner of a mobilehome park brought this unlawful detainer action against tenants renting a space in the
 
 *1525
 
 park. Under the Mobilehome Residency Law, Civil Code section 798 et seq., a park owner may terminate a mobilehome park tenancy when there is a “change of use of the park or any portion thereof.” (Civ. Code, § 798.56, subd. (g).) The park owner claimed that the vacancy of the one space resulting from the eviction of these tenants constituted a change of use of a portion of the park, within the meaning of section 798.56, subdivision (g). The municipal court granted judgment for the park owner. The Appellate Department of the Santa Cruz Superior Court affirmed and certified the matter to this court as a case of first impression.
 

 We find that the eviction was unlawful under Civil Code section 798.56, subdivision (g), and further that the park owner failed to comply with the provisions of Government Code section 65863.7, which requires the filing and review of a tenant impact report before any change of use of a mobile-home park can occur. We therefore reverse the judgment.
 

 Governing Law
 

 The Mobilehome Residency Law, enacted in 1978,
 
 [1]
 
 is a comprehensive statutory scheme which defines the rights and obligations of mobilehome park landlords and the tenants renting spaces in the park. Article 6 of the law is entitled “Termination of Tenancy” and contains the following statement of purpose: “The Legislature finds and declares that, because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the costs of landscaping or lot preparation, it is necessary that the owners of mobile-homes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter.” (Civ. Code, § 798.55, subd. (a).) Consistent with this purpose, the law provides that the management of a park “shall not terminate or refuse to renew a tenancy, except for a reason specified in this article . . . .” (Civ. Code, § 798.55, subd. (b).)
 

 The exclusive list of authorized reasons for termination is set forth in Civil Code section 798.56, subdivisions (a) through (g). Under subdivision (g), which concerns us here, a tenancy may be terminated if there is a “Change of use of the park or any portion thereof, provided:
 

 “(1) The management gives the homeowners at least 15 days’ written notice that the management will be appearing before a local governmental board, commission, or body to request permits for a change of use of the mobilehome park.
 

 
 *1526
 
 “(2) After all required permits requesting a change of use have been approved by the local governmental board, commission, or body, the management shall give the homeowners six months’ or more written notice of termination of tenancy.
 

 “If the change of use requires no local governmental permits, then notice shall be given 12 months or more prior to the management’s determination that a change of use will occur. The management in the notice shall disclose and describe in detail the nature of the change of use.
 

 “(3) The management gives each proposed homeowner written notice thereof prior to the inception of his or her tenancy that the management is requesting a change of use before local governmental bodies or that a change of use request has been granted. . . .”
 

 Subdivision (h) of Civil Code section 798.56, which was added to the statute in 1988,
 
 [2]
 
 further provides that “[t]he report required pursuant to subdivisions (b) and (i) of [s]ection 65863.7 of the Government Code shall be given to the homeowners or residents at the same time that notice is required pursuant to subdivision (g) of this section.”
 

 Government Code section 65863.7 provides that certain procedures must be followed when a park owner closes the park or converts to another use, thereby displacing the residents. The report referred to in subdivision (h) of Civil Code section 798.56, is known as a relocation impact report, or a tenant impact report, and is described more fully in subdivision (a) of section 65863.7: “Prior to the conversion of a mobilehome park to another use . . . or prior to closure of a mobilehome park or cessation of use of the land as a mobilehome park, the person or entity proposing the change in use shall file a report on the impact of the conversion, closure, or cessation of use upon the displaced residents of the mobilehome park to be converted or closed. In determining the impact of the conversion, closure or cessation of use on displaced mobilehome park residents, the report shall address the availability of adequate replacement housing in mobilehome parks and relocation costs.”
 

 Government Code section 65863.7 further provides:
 

 “(b) The person proposing the change in use shall provide a copy of the report to a resident of each mobilehome in the mobilehome park at least 15 days prior to the hearing, if any, on the impact report by the advisory agency, or if there is no advisory agency, by the legislative body.
 

 “(c) When the impact report is filed prior to the closure or cessation of use, the person or entity proposing the change shall provide a copy of the
 
 *1527
 
 report to a resident of each mobilehome in the mobilehome park at the same time as the notice of the change is provided to the residents pursuant to paragraph (2) of subdivision (f) [now (g)] of [s]ection 798.56 of the Civil Code.
 

 “(d) When the impact report is filed prior to the closure or cessation of use, the person or entity filing the report or park resident may request, and shall have a right to, a hearing before the legislative body on the sufficiency of the report.
 

 “(e) The legislative body, or its delegated advisory agency, shall review the report, prior to any change of use, and may require, as a condition of the change, the person or entity to take steps to mitigate any adverse impact of the conversion, closure, or cessation of use on the ability of displaced mobilehome park residents to find adequate housing in a mobilehome park. The steps required to be taken to mitigate shall not exceed the reasonable costs of relocation. . . .”
 

 Government Code section 65863.8 further ensures that the residents of the mobilehome park have been properly notified before any hearing on a change of use of the park takes place. It provides that “[a] local agency to which application has been made for the conversion of a mobilehome park to another use shall, at least 30 days prior to a hearing or any other action on the application, inform the applicant in writing of the provisions of [s]ection 798.56 of the Civil Code and all applicable local requirements which impose upon the applicant a duty to notify residents and mobilehome owners of the mobilehome park of the proposed change in use, and shall specify therein the manner in which the applicant shall verify that residents and mobilehome owners of the mobilehome park have been notified of the proposed change in use. Neither a hearing on the application, nor any other action thereon, shall be taken by the local agency before the applicant has satisfactorily verified that the residents and mobilehome owners have been so notified, in the manner prescribed by law or local regulation.”
 

 Local regulations in this case are found in chapter 17.90 of the Capitola Municipal Code, which pertains to “Changes of Use of Mobilehome Parks.” Chapter 17.90 was adopted May 1, 1985, and was subsequently amended into its present form, Ordinance No. 759, adopted October 28, 1993. The local code was enacted in order to carry out state laws and effectuate the purposes behind those laws. It provides a procedure for reviewing applications for a change of use or closure of a mobilehome park, and for determining reasonable mitigation measures. (See generally, Capitola Mun. Code, § 17.90.010.)
 

 
 *1528
 
 Factual Background
 

 Castle Estates Mobilehome Park is a 108-space mobilehome park located in the City of Capitola, The park contains a mix of single and double-wide mobilehomes of varying ages.
 

 In July of 1992, the Walters family negotiated the purchase of a double-wide mobilehome situated at space No. 97 at Castle Estates and applied to the park owner to rent space No. 97. The Walters were provided, and acknowledged receipt of, a form letter from the management of the park, entitled “Letter to Prospective Homeowner.” This letter informed them that the owner of the park was dissatisfied with the Capitola Mobilehome Park Rent Control Ordinance and felt he could not operate the park profitably. He was therefore considering closing spaces in the park whenever a coach was transferred to a new tenant. “By closing spaces after sale,” the letter explained, “the park owner will, over time, regain the property for other forms of development.” The letter further stated that the park owner would simply refuse to rent to new tenants were it not for the constraints of the Mobile-home Residency Law.
 
 [3]
 
 The letter concluded: “Therefore, by this letter, we are informing you that upon transfer of this coach, Castle Mobilehome Estates may take action to close space No. 97, as a mobilehome space and terminate its use as a mobilehome space for rent. Under the provisions of Civil Code [s]ection 798.56, this change of use of the space to discontinue it as a mobilehome park space requires a twelve-month notice to terminate your tenancy provided no local government permits are required.” The Walters proceeded with the purchase of the mobilehome and on August 5, 1992, they signed a rental agreement to rent space No. 97 at the park on a month to month tenancy.
 

 On June 14, 1993, the Walters were served with a document entitled “Notice of Termination (Change in Use).” This notified them that pursuant to Civil Code section 798.56, subdivision (g), their tenancy of space No. 97 would be terminated one year after the service of the notice. The reason relied on for the termination was that the park owner intended to change the use of the park. The notice referred to the reasons stated in the previous letter, a copy of which was attached.
 

 Along with the one-year notice of termination, the Walters were served with a “Relocation Impact Report.” This report reiterated the owner’s plan to close spaces in the park, as coaches were transferred to new tenants, in order to regain the property over time for other forms of development. The report
 
 *1529
 
 stated that vacant spaces in mobilehome parks which would accommodate used mobilehomes are extremely scarce in California. In fact the report concluded, based on a survey of mobilehome parks in the area, that “no empty space was found in 52 parks within 25 miles to relocate a double wide mobilehome” such as the Walters’. The report further stated that there were some spaces available in central California; however, it found only one park with a space possibly becoming available which would take an older mobilehome with a family. This park was in Marysville. The cost of transporting the Walters’ mobilehome to Marysville was estimated at $6,700, with other incidental costs of over $2,000. The report suggested various mitigation measures: the Walters could sell their coach and buy a newer one already installed in a space in some other park. They could move to the more outlying areas of California, where there are typically more vacant spaces in mobilehome parks. They could explore housing alternatives such as condominiums, apartments and single-family homes. Or a “Relocation Assistance Director” could be appointed to assess the Walters’ situation.
 

 Copies of the one-year “Notice of Termination” and the “Relocation Impact Report” were sent to the other residents in Castle Estates and to the Capitola City Attorney, Richard Manning. A cover letter to Manning, dated June 11, 1993, informed him that the documents were being served on the Walters and that copies were enclosed “[f]or your information.”
 

 Manning immediately wrote to counsel for the park owner, explaining his view that Government Code section 65863.7 required the impact report to be “filed” with the city before it was sent to the residents pursuant to Civil Code section 798.56, subdivision (h). Manning also stated his opinion that vacating a single space in a park, while the remaining spaces continued to be rented, did not constitute a “change of use” under Civil Code section 798.56, subdivision (g).
 

 On August 19, 1993, the city attorney sent another letter to counsel for the park owner, reiterating his opinion regarding the legalities of the purported eviction of the Walters and requesting a response. Counsel responded by letter dated August 25, 1993. He stated that the owner of Castle Estates “intends to continue his practice of closing one space at a time as this is the only way he can recover possession of his property and use thereof due to the restrictions imposed by state law and local ordinances.” Counsel expressed the view that “state law permits a mobilehome park [owner] to terminate tenancy by giving a 12-month notice that the use of a part of the park, i.e., that homeowner’s space, is being changed.” Counsel further asserted that the copy of the “Notice of Termination” and “Relocation Impact Report” previously sent to the city attorney on June 11, 1993, constituted a sufficient filing under the relevant statutes.
 

 
 *1530
 
 Over the next few months, the Capitola Conversion Ordinance was amended and the amended Ordinance No. 759 was adopted October 28, 1993. The amended ordinance specifically provides that the “Relocation Impact Report” must be filed with the planning director prior to any change of use of a mobilehome park. (Capitola Mun. Code, §§ 17.090.025, 17.090.040.) The required contents of the report are set forth in section 17.090.030. Section 17.90.070 details the procedure for review of the application for change of use and the relocation impact report.
 

 On January 27, 1994, the city attorney wrote again to counsel for the park owner, referring to state law and enclosing a copy of Ordinance No. 759. The letter restated the city’s position that the eviction of a tenant occupying a single space in a mobilehome park does not constitute a “change of use” of the park, and further that there had been no formal filing of a relocation impact report with the city, which was necessary to initiate the review process mandated by state law.
 

 Over a year went by. On April 21, 1995, the park owner served on the Walters a “Sixty (60) Day Notice Terminating Tenancy.” The notice informed them that their tenancy of space No. 97 at Castle Estates was terminated and that they must deliver possession of the premises on or before June 30, 1995. The notice stated that the termination was for the reason that “there will be a change of use of the Park or any portion thereof,” pursuant to Civil Code section 798.56, subdivision (g).
 

 The Walters continued to occupy space No. 97 and on July 11, 1995, the owner filed an unlawful detainer action against them. Trial of the unlawful detainer action was held in municipal court August 30, 1995, and the court rendered judgment in favor of the park owner. The Walters’ motion for a new trial was denied and they appealed the matter to the Appellate Department of the Santa Cruz Superior Court. The appellate department affirmed the judgment after a hearing on March 14, 1996. The appellate department then certified the case for transfer to this court, on grounds that there is a lack of appellate authority on the issues and because it was anticipated that the subject conduct would continue. We accepted transfer August 30, 1996.
 

 Issues
 

 Appellants argue first that the termination of their tenancy was unlawful because a forced vacancy of a single space in a mobilehome park does not constitute a “change of use of the park or any portion thereof,” within the meaning of Civil Code section 798.56, subdivision (g). They argue further that if, as the park owner has maintained, the termination of
 
 *1531
 
 their tenancy is but the first step in a plan to close the entire park for eventual use for other purposes, the owner must comply with the requirements of Government Code section 65863.7, and has not done so here. We agree with appellants on both of these claims.
 

 “It is elementary that the construction of a statute and the question of whether it is applicable present solely questions of law.”
 
 (Dean W. Knight & Sons, Inc.
 
 v.
 
 State of California
 
 ex rel.
 
 Dept, of Transportation
 
 (1984) 155 Cal.App.3d 300, 305 [202 Cal.Rptr. 44].) We therefore conduct an independent review.
 

 I.
 

 A mobilehome park is defined in the Mobilehome Park Residency Law as “an area of land where two or more mobilehome sites are rented, or held out for rent, to accommodate mobilehomes used for human habitation.” (Civ. Code, § 798.4.) Under Civil Code section 798.56, subdivision (g), a park owner may terminate a tenancy only if there is a “change of use of the park or any portion thereof . ...” A “change of use” is more particularly described in section 798.10 as follows: “ ‘Change of use’ means a use of the park for a purpose other than the rental, or the holding out for rent, of two or more mobilehome sites to accommodate mobilehomes used for human habitation, and does not mean the adoption, amendment, or repeal of a park rule or regulation. A change of use may affect an entire park or any portion thereof. ‘Change of use’ includes, but is not limited to, a change of the park or any portion thereof to a condominium, stock cooperative, planned unit development, or any form of ownership wherein spaces within the park are to be sold.”
 

 Respondent’s position appears to be that the projected vacancy of space No. 97 after the Walters are evicted is the required “change of use” of a portion of the park, sufficient to justify termination of the tenancy under Civil Code section 798.56, subdivision (g). In other words the vacancy resulting from the eviction itself provides the reason for the eviction. Such an interpretation of the statute is not only illogical, but it is also completely at odds with the stated purpose of this article of the Mobilehome Residency Law, which is to provide the homeowner with “unique protection from actual or constructive eviction.” (Civ. Code, § 798.55, subd. (a).) If a park owner were able to force tenants out one by one by simply asserting that each eviction constituted a change in the use of that space, the owner would be allowed to accomplish the precise result the law was enacted to prevent. Section 798.56 was clearly intended to limit the grounds upon which a tenancy could be terminated and it must be interpreted in that light.
 

 
 *1532
 
 Respondent contends that one space in a mobilehome park qualifies as “any portion” of the park, within the meaning of Civil Code sections 798.10 and 798.56, subdivision (g). We disagree. The change of use provisions of the Mobilehome Park Residency Law contemplate a circumstance where the park owner converts land used for mobilehome park purposes, i.e., two or more rentable sites for mobilehomes, to some other use. Although a change of use can apply to the entire park or only a portion thereof, it cannot apply to one space, because one space, under the definition contained in section 798.4, does not qualify as a mobilehome park use. Thus, there can technically be no “change of use” of one space from mobilehome park use to some other use.
 

 In a larger sense we do not believe the Legislature could have intended the change of use statute to apply to the situation here, where one tenant is evicted while the remaining 107 spaces continue to be rented out. Rather the plain meaning of the statute is that a change of use occurs if the mobilehome park, or a functional part of it, is no longer used as a mobilehome park.
 

 The legislative history of Civil Code section 798.10 fully supports this interpretation and illuminates the intent behind the “change of use” provision in section 798.56, subdivision (g). The year after the Mobilehome Park Residency Law was passed, bills were introduced in both the Assembly and the Senate to add section 798.10 to the code in order to clarify and define the term “change of use” in section 798.56, subdivision (g). (See Stats. 1979, ch. 945, § 1, p. 3266.) The report prepared by the Assembly Committee on Judiciary explained that the objective of the bill was “to prevent mobilehome park management from improperly evicting tenants by alleging that it intends to change the use of a park.” (Assem. Com. on Judiciary, Bill Dig., Hearing date July 18, 1979.) It was reported that park owners were using the “change of use” notice to harass tenants or to justify tenant terminations. In one case the park owner purported to change all of the leases parkwide from 12-month leases to 40-year leases, denoting this a “change of use” sufficient to evict any tenant who refused to sign the new lease. The legislation was intended to counteract this and other abuses and to provide additional safeguards to ensure “that a change of use was not being fabricated as a pretense for terminating park tenancies.”
 

 The analysis of Senate Bill No. 1170 by the Department of Housing and Community Development contains a similar statement of legislative purpose: “This bill would make clear that the term ‘change of use’ (which is presently undefined), means that there will be a change from the rental of mobilehome sites to a use other than rental of mobilehome sites. This term is being abused in many parts of the state, as construed to imply a ‘change’ to
 
 *1533
 
 an all-adult park, or that portions of the park will be set aside for particular uses. These abuses run counter to the initial intent for enactment—that because large mobilehomes are so expensive and difficult to move, the grounds for eviction should be limited to those which are
 
 critical,
 
 such as nonpayment of rent, detrimental conduct by the tenant, etc.” (Italics in original.)
 

 We conclude that the park owner’s practice here of evicting tenants on the basis that the resulting vacancy of each space constitutes a change of use of a portion of the park violates both the letter and the spirit of the change of use statute. The eviction is therefore unauthorized under Civil Code section 798.56, subdivision (g).
 

 Respondent argues that as a property owner he has a “fundamental vested right” to go out of business and leave his rental property vacant.
 
 (301 Ocean Avenue Corp.
 
 v.
 
 Santa Monica Rent Control Bd.
 
 (1991) 228 Cal.App.3d 1548, 1557-1558 [279 Cal.Rptr. 636]; Gov. Code, § 7060, subd. (a).) As is reflected in respondent’s letter to prospective tenants, his plan was to eventually convert the park to some other more profitable development use by evicting tenants one by one under Civil Code section 798.56, subdivision (g) and holding the spaces unoccupied until the entire park was vacant.
 

 As respondent points out, Government Code section 7060.7, known as the Ellis Act, expressly permits a landlord to go out of business. However, respondent did not raise or argue the Ellis Act at the trial of this matter. Moreover, as respondent concedes, the Ellis Act provides that it is not intended to alter the rights and obligations set forth in Civil Code section 798.56, subdivision (g) and Government Code section 65863.7. (Gov. Code, § 7060.7, subd. (5).) Thus, the Ellis Act is not controlling here.
 

 We agree with respondent that a park owner is entitled to convert property used as a mobilehome park to another use, or even to hold it as vacant land. And we are not unsympathetic to the plight of the mobilehome park owner, whose property rights are impacted by the various laws and regulations affecting mobilehome parks. Regardless of our views, however, our task as an intermediate court of appeal is limited to interpreting and applying existing law. For instance, Civil Code section 798.56, subdivision (g)(2), provides that an owner relying on such a change of use to evict his tenants must “disclose and describe in detail the nature of the change of use” at the time of the 12-month notice. Similarly, section 798.57 requires management to be factually specific in describing the reasons for terminating a tenancy. Here, the park owner’s stated reason for terminating the Walters’ tenancy was that “[b]y closing spaces after sale, the park owner will, over time,
 
 *1534
 
 regain the property for other forms of development.” A statement that the use of the property will be changed to accommodate some other form of development to be determined at a future date does not comply with the statutory requirements for a specific plan.
 

 Moreover, any such conversion or closure plan also requires compliance with Government Code sections 65863.7 and 65863.8 and with local ordinance. Here again, as we explain below, the Legislature has acted to protect mobilehome dwellers, not only from arbitrary and capricious conversions but also from the harsh effects of displacement resulting from legitimate conversions.
 

 II.
 

 When a park owner plans to convert or close a mobilehome park, he or she must comply with certain specific notice and reporting requirements. (Civ. Code, § 798.56, subd. (h); Gov. Code, §§ 65863.7 and 65863.8.) Among other things the park owner must file an impact report with the local legislative body, describing the impact of the conversion or closure on the displaced residents and addressing the availability of adequate replacement housing and relocation costs. (Gov. Code, § 65863.7.) The owner must also provide copies of the report to each mobilehome resident in the park at the same time as the notice of change of use is provided to the residents under Civil Code section 798.56, subdivision (g)(2). (Gov. Code, § 65863.7, subd. (c).) The local legislative body must review the report prior to the change of use and may require the park owner to take steps to mitigate any adverse impacts of the conversion on the displaced residents. (Gov. Code, § 65863.7, subd. (e).) A public hearing must be held if requested by either the park owner or a park resident. (Gov. Code, § 65863.7, subd. (d).) And under section 65863.8 of the Government Code, the local legislative body must notify a park owner applying for a change of use as to the notice requirements of Civil Code section 798.56 and must verify that all residents have been properly notified prior to a hearing or any other action regarding the change of use.
 

 Appellants claim respondent did not comply with the Government Code section 65863.7 requirements. Respondent contends first that section 65863.7 does not apply in this case because he was changing the use of only one space rather than converting the entire mobilehome park. Next he argues that even if section 65863.7 does apply, he fully complied with the notice and filing requirements of that section.
 

 The basis for respondent’s first claim is that Government Code section 65863.7 refers only to “a mobilehome park” whereas Civil Code section
 
 *1535
 
 798.56, subdivision (g) refers to a change of use of “the park or any portion thereof.” Therefore, he argues, the requirements of section 65863.7 apply only if the entire park is converted. Where the change of use affects something less than the entire park, compliance is excused. In essence respondent’s contention would mean that a park owner could change the use of a portion of the park, sufficient to justify terminating tenancies under section 798.56, subdivision (g), but would not need to comply with the notice and reporting requirements under sections 65863.7 and 65863.8, so long as some portion of the park continued to be used as a mobilehome park.
 

 Such an interpretation is untenable. The two statutes were clearly intended to function together as an integrated scheme, as is evidenced by the cross-references contained in Civil Code section 798.56, subdivision (h), and Government Code sections 65863.7, subdivision (c) and 65863.8. There is no rational explanation why the Legislature would use the phrase “change of use” in the Mobilehome Residency Law and not intend the same meaning in the Government Code section referred to therein. Obviously, a tenant who is displaced by a partial closure of a park is as much in need of the protections provided by the Government Code as a tenant in a park which is closed entirely. We therefore conclude that the notice and reporting requirements set forth in Government Code sections 65863.7 and 65863.8 apply whenever there is a change of use of the entire park or a functional portion thereof which results in the displacement of tenants.
 

 Perhaps anticipating such a conclusion, respondent contends he complied with all necessary requirements by serving the Walters with a one-year notice of change of use and a copy of a tenant impact report (Gov. Code, § 65863.7, subd. (c); Civ. Code, § 798.56, subds. (g)(2) & (h)), by providing copies of the report and notice to all of the other residents of the park (Gov. Code, § 65863.7, subd. (c)), and by sending a copy of the report and notice to the Capitola city attorney, marked “For Your Information” (Gov. Code, § 65863.7, subd. (a).). He contends the review required by section 65863.7, subdivision (e) and the hearing referred to in subdivisions (b) and (d) were not necessary here for various reasons: There was no local ordinance providing for a review procedure, no permits or zoning changes were sought, and no one requested a hearing.
 

 We disagree with respondent’s reading of the statute. The purposes of Government Code section 65863.7 are to ensure that the local legislative body reviews the impact on the mobilehome park tenants of a change of use of the property, that mitigation measures are considered and that the tenants are involved in the process. Since these protections are dependent upon a meaningful review of the impact report, the language of the statute makes
 
 *1536
 
 this review mandatory: “The legislative body, or its delegated advisory agency,
 
 shall review
 
 the report, prior to any change of use, and may require, as a condition of the change, the person or entity to take steps to mitigate any adverse impact of the conversion, closure, or cessation of use on the ability of displaced mobilehome park residents to find adequate housing in a mobilehome park.” (Gov. Code, § 65863.7, subd. (e), italics added.)
 

 Review is initiated by the filing of the impact report with the local legislative body. Here there was no such filing. Respondent simply sent a copy of the report to the city attorney marked for informational purposes. Respondent reads the statute to provide that the report need only be filed “upon the displaced residents” of the park. (Gov. Code, § 65863.7, subd. (a).) Read in context, however, the quoted language obviously refers to the impact of the conversion “upon the displaced residents,” not to a filing of the report “upon the displaced residents.” It is common sense that residents do not accept documents for “filing.” Moreover, Government Code section 65863.7, subdivision (c) directs that when the report is “filed,” the person requesting the change of use “shall provide a copy of the report” to each resident of the mobilehome. If the initial filing were to be upon the residents, this subdivision would be redundant. And finally, respondent’s interpretation is totally inconsistent with the rest of the statute, which provides the various steps for review by the local legislative body.
 

 A formal filing of a statutory report does more than simply make its contents known to the local agency. It communicates that the submitting party intends to initiate and participate in the review process mandated by Government Code section 65863.7, that the document submitted is the one formally designated as the required report, and that the agency may begin the review and notification procedure set forth in the statute. A report which is simply sent to the residents with a copy mailed to the city attorney accomplishes none of these purposes.
 

 Schaefer Dixon Associates
 
 v.
 
 Santa Ana Watershed Project Authority
 
 (1996) 48 Cal.App.4th 524 [55 Cal.Rptr.2d 698] illustrates this point in a somewhat different setting. In that case, a plaintiff failed to file a formal tort claim, although a series of letters essentially related all the necessary information. The court held that these informational letters did not meet the statutory requirement that a document be “filed,” even though they contained a demand for damages. Rather than being “presented” to the proper person representing the public entity, the letters were directed to the personal attention of the general manager of the public entity. A formal filing, the court observed, alerts the agency of the need to conduct an investigation, to notify the party if the claim is considered insufficient, and to correctly
 
 *1537
 
 calendar necessary events such as statutes of limitations.
 
 (Id.
 
 at pp. 534-535.) We conclude that respondent’s mailing of a copy of the impact report to the city attorney in this case did not constitute a filing within the meaning of the statute.
 

 This conclusion disposes of respondent’s claim that no hearing was required here because none was requested.
 
 [4]
 
 We agree that the statute appears to contemplate that if neither the park owner nor a park resident requests a public hearing, no hearing need be held. (Gov. Code, § 65863.7, subds. (b) & (d).) However, the right to request a hearing on the sufficiency of the report is triggered by the filing of the report itself. (Gov. Code, § 65863.7, subd. (d).) Here, as we have found, the tenant impact report prepared by the park owner was never filed with the city. Consequently, the review process was never initiated and the right to request a hearing did not arise. Furthermore, even if no hearing is requested, the local agency must nonetheless review the report “prior to any change of use.” (Gov. Code, § 65863.7, subd. (e).)
 

 Respondent contends that at the time he served the one-year notice of termination and change of use on the Walters in June of 1993, Capitola had no ordinance providing a procedure for filing and reviewing an impact report concerning the closure of a mobilehome park. The present ordinance was adopted in October of 1993, several months later. Respondent claims this excused him from the duty to file an application and a tenant impact report for review by the City. We are not persuaded by this argument, for several reasons.
 

 The ordinance which was in place in June of 1993, Ordinance No. 576, provided that a “conversion,” which meant “changing the use of any property previously used as a mobilehome park to a use other than mobilehome park,” required an application and an impact report. These were subject to review and approval by the decision making body of the City. (See former Capitola Mun. Code, §§ 17.90.010, 17.90.040, 17.90.050.) Respondent argues that these sections did not apply to him because his change of use did not involve any permits or rezoning. However, the clear import of the ordinance was that any change which “could result in the loss of mobile-home park spaces” was subject to review. (Capitola Mun. Code, § 17.90.010.)
 

 Furthermore, any ambiguity in the former ordinance regarding filing and review requirements was clarified in this case by the city attorney, who notified respondent repeatedly, following receipt of copies of the notice and
 
 *1538
 
 report served on the Walters, that the city did not consider this to be a sufficient filing, that the city wished to review the report and that the city viewed the termination of the Walters’ tenancy as an unlawful eviction. Counsel for respondent was aware that an amendment to the existing ordinance was in process and he had apparently attended a session of the city council discussing the early versions of the amendment. Ordinance No. 759 was passed October 28, 1993 and counsel was sent a copy of the ordinance in January of 1994. Thus, respondent was well aware of local rules and nonetheless made no effort to comply. More than a year passed before the attempted eviction was resumed, by the service of the 60-day notice on the tenants in April of 1995.
 

 Regardless of the status of the local ordinance, the filing and review of an impact report was at all times mandated by state law, pursuant to Government Code section 65863.7. The requirements of this section were not made dependent upon the enactment of a local ordinance and are not excused by the fact that the local ordinance did not describe a particular filing and review process at the time respondent first served notice on the Walters. In
 
 Friends of Mammoth
 
 v.
 
 Board of Supervisors
 
 (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049] disapproved on other grounds in
 
 Kowis
 
 v.
 
 Howard
 
 (1992) 3 Cal.4th 888 [12 Cal.Rptr.2d 728, 838 P.2d 250], the Supreme Court addressed a similar circumstance involving Public Resources Code section 21151. That statute set forth the requirement that an environmental impact report must be prepared “on any project they [local governmental agencies] intend to carry out which may have a significant effect on the environment. . . .” (8 Cal.3d at pp. 274-275.) The court held that this statute applied to government approval of private development projects.
 
 (Id.
 
 at p. 259.) Although there was no local enabling legislation providing for a review of an impact report prior to approving a development project, the California Supreme Court ruled that the developer could not proceed with its underlying project until such time as the impact report was properly prepared and considered. The court recognized that projects could be delayed while the local agency developed procedures for reviewing the impact report, but found that such delays were “implicit” in the Legislature’s decision to require preparation of the report.
 
 (Id.
 
 at p. 273.) In other words, the absence of local rules governing review of the impact report did not excuse compliance with the state mandate. (See Pub. Resources Code, § 21169, limiting the retroactive effect of
 
 Friends of Mammoth
 
 v.
 
 Board of Supervisors, supra,
 
 8 Cal.3d 247.)
 

 Finally, respondent argues that he complied with Government Code section 65863.7 to the fullest extent possible, because although his intent was to close the entire park space by space, he did not have any particular development plan in mind. Without any specific development plan, he argues, it
 
 *1539
 
 would have been premature to apply for the necessary use permits or zoning changes or approval of the conversion plan. Respondent thus suggests he should be allowed to evict tenants one by one, close the entire park and then apply to develop the property for some other use. This is precisely the situation that section 65863.7 was intended to prevent. Prior to 1985 that section required an impact report only when mobilehome parks were converted to another use. In 1985 section 65863.7 was amended to include the closure of a park or the cessation of use of the property as a park. (Stats. 1985, ch. 1260, § 1, pp. 4328-4329, Sen. Bill No. 316.) As explained by the author of the bill, “some park owners have gotten around the law by simply closing the park, forcing long-term residents to move out, and letting the land sit idle until it can be developed into another commercial or lucrative venture. [Statement by Senator Bill Craven on the passage of Senate Bill No. 316, October 2,1985.]” Senate Bill No. 316 was therefore intended “to close a loophole in the law that would permit a mobilehome park to close, move out its tenants and later convert to another use without having to meet the requirements of law or local ordinance to assist their tenants [to] relocate. [Sen. Bill No. 316, Report of Senate Housing and Urban Affairs Committee, Feb. 4, 1985.]” Respondent’s practice here is in direct conflict with the purpose and intent of Government Code section 65863.7.
 

 Disposition
 

 The judgment of the municipal court granting possession of the property to respondent is reversed and the court is directed to enter judgment in favor of appellants. Appellants are to have costs on appeal.
 

 Cottle, P. J., and Mihara, J., concurred.
 

 A petition for a rehearing was denied July 17, 1997, and appellants’ petition for review by the Supreme Court was denied September 24, 1997. Baxter, J., did not participate therein.
 

 [1]
 

 Statutes 1978, chapter 1031, section 1, page 3178.
 

 [2]
 

 Statutes 1988, chapter 301, section 2.5, pages 1029 to 1030.
 

 [3]
 

 Under Civil Code section 798.74, subdivision (a), park owners may not refuse to rent to tenants who are financially qualified and will obey park rules.
 

 [4]
 

 The Walters eventually requested a hearing, but not until November of 1994.